21 P.(2d) 813

## STATE v. JOHNSON.

No. 3814.

Supreme Court of New Mexico.

March 28, 1933.

Rehearing Denied May 15, 1933.

J. H. Crist, of Santa Fé, for appellant.

E. K. Neumann, Atty. Gen., and Frank H. Patton, Asst. Atty. Gen., for the State.

SADLER, Justice.

Defendant prosecutes this appeal from a conviction of murder in the first degree.

About the hour of midnight on November 15, 1931, the victim of this tragedy, a young lady eighteen years of age, was criminally assaulted and murdered in her bedroom at the home of her mother on Griffin street in the city of Santa Fé. Near the same hour a brutal assault with a hammer was made upon the person of Oscar Churchill, night man at Andrews Garage on Water street in said city, the cash register of the garage looted, and a car belonging to the garage stolen.

A few hours thereafter, Thomas C. Johnson, a negro attendant at the garage in question, was arrested in Albuquerque in the stolen car. He readily admitted the assault upon Churchill, looting of the cash register, and theft of the automobile, but expressly denied all knowledge of the above-mentioned criminal assault and slaying. He was returned to Santa Fé and lodged in the penitentiary for safe-keeping.

The incriminatory facts developed against the defendant at the trial, and which the jury would have been warranted in accepting, are as follows: The mother of deceased was

aroused by a bright light shining on her face about the time of the crime against her daughter. She proceeded from her bedroom through the living room to the door of the daughter's room. She found the room brightly lighted, and observed a stout, stockily built man, garbed in what she described as a "white and black striped" suit, standing beside her daughter's bed, with his back toward the mother. The mother screamed and apparently fainted, as she was able to recall nothing of what transpired thereafter. It was the theory of the state that she was struck with a green vase in the hands of defendant, broken fragments of which were found scattered over the living room and the daughter's bedroom. The mother bore evidences of having been struck with something. Fingerprints of defendant's left middle finger and right thumb were found at the scene of the crime, each on a separate and distinct fragment of this broken vase. The fragments were identified as parts of a glass vase belonging in the household.

Although not residing in the vicinity, defendant was found loitering in proximity to deceased's home one morning about 1:30 o'clock in early September preceding the tragedy, and was unable to give to the officers accosting him a satisfactory explanation of his presence in the neighborhood. Again, he was seen late on the very night of the tragedy, proceeding down Johnson street just west of its intersection with Grant avenue, not far removed from deceased's home, and, when asked by the witness, who knew and recognized him, what he was doing over there "this time of night," he replied: "I got a job over here."

When arrested, defendant's outer garment was a suit of white and blue striped coveralls which the mother said resembled the suit worn by the man discovered by her in her daughter's bedroom. He wore underneath the coveralls two top shirts, a pair of corduroy pants, shorts, and undershirt. He also had on his person a pocketknife such as could have been used to inflict the fatal wound— a stab through the left temple which fractured the skull and penetrated the brain. According to testimony in the case, defendant claimed it was a knife he used to repair tires, and stated that he had washed or cleaned it in his room. He admitted visiting his room just before fleeing Santa Fé in the stolen car. The deceased was shown to have bled freely as a result of the fatal wound and criminal assault. Different garments worn by defendant at the time of his arrest contained blood splotches, and his hands were bloody. These blood splotches were explained by him as having been received in dragging the body of Churchill from the scene of the assault in the garage to the place in the garage where his unconscious form was later discovered. It was a fact that Churchill had also bled freely from head injuries inflicted upon him by the hammer in defendant's hands.

The body of deceased when discovered disclosed that a strip of cloth had been forced into her mouth as a gag and tied behind her

head, rendering it likely that the hands and nails of her assailant contacted the lips of the deceased. Saturday, the day before the homicide, deceased had purchased a tube of lipstick known as "Kiss-Proof." Upon the afternoon of November 15th, the date of the homicide, deceased was shown to have lipstick on her lips. A lipstick of the "Kiss-Proof" brand was taken from the drawer of the dresser in the mother's room on November 17th by one of the officers working on the case.

Solubility tests by an expert on slides used in connection with microscopic examinations disclosed that débris taken from underneath the finger nails of deceased and defendant each contained, in the clumps of skin particles found in said débris, a number of small bright carmine red particles, highly transparent, which did not dissolve in either the salt solution or water, and which were identical in color, appearance, and refraction. A like test of débris taken from underneath the expert's finger nails failed to disclose these bright carmine red particles. Continuing his test with the lipstick as a control, the expert made a light smear from same across his left hand, and rubbed the fingers of his right hand across the smear. Some eight hours later, after having washed his hands and had them in soapy water more than the ordinary number of times, and after having used his hands in rubbing hair tonic into his hair, he gave débris taken from underneath the nails of his fingers on the right hand the same test, and found imbedded in the particles of skin a number of bright carmine red colored highly refractile particles which he described as identical in "color, shape, refraction and appearance" with those found in the débris taken from the nails of deceased and defendant.

In addition, this expert found in the débris from underneath deceased's nails several plant fibers colored blue, which he described as identical in appearance with blue cotton fibers scraped by him from the blue and white coveralls worn by defendant on the night in question.

At the time of his arrest in Albuquerque, and while defendant was being questioned by one of the officers, and before the name of the party hereinafter referred to had been mentioned, defendant, referring to the person, who, as a witness, as it subsequently developed, was to identify him as the person he saw near the scene of the homicide late on the night thereof, compared the officer to such person, and stated this person, the subsequent witness, "would say anything to hang a man." So far as the record discloses, the officers did not at that time know defendant had been seen in the vicinity of deceased's home a short time prior to the homicide.

A car washer, an article in common use around garages, was found underneath the bed of deceased.

As against this damaging and highly incriminatory evidence, the defendant denied all knowledge of the crime committed at the home of deceased and the concomitant parts thereof. As above noted, he sought to account

for the blood on his clothes and hands as resulting from the assault on Churchill; averred that he had left Santa Fé early on the morning of November 15th to visit a sick acquaintance in Albuquerque; that the friend whom he had gone to visit was not at home; that he had immediately started on his return trip to Santa Fé; that he had "hitch-hiked" rides with strangers unknown to him on the trip to and from Albuquerque, arriving back in Santa Fé about 9 p. m.; that shortly after his return to Santa Fé he had gone to the home of a friend from whom he had borrowed some money to make reimbursement of money taken by him from the cash register of the garage where he was employed; that he had then visited a local pool room, and had there spent some two or two and a half hours in gambling, losing the borrowed money; that shortly after leaving the pool room he had again visited his place of employment at the garage, where he became involved in a quarrel with Churchill, the night man, over the $2 taken from the cash register; that this quarrel resulted in the assault upon Churchill; that, realizing his predicament, and fearing Churchill might not survive, he appropriated the automobile in question and fled the city.

Aside from apparent improbabilities embraced in the story as related by him, defendant was unable to corroborate it in any material particular. The state impeached it in many respects. It was shown by more than one witness, including the person from whom he borrowed money as related by him, that defendant was seen on the streets of Santa Fé as early as 7:30 p. m. of the date involved. At a time when according to his story he was engaged in gambling at a local pool room, he was seen, spoken to, and recognized in the vicinity of deceased's home. The proprietor of the pool hall in question testified that he came to his pool hall about 8:30 p. m. and left about 9 o'clock. Churchill, the victim of defendant's assault at the garage, while admitting defendant had inquired what the proprietor had said about the $2 taken by defendant from the cash register, denied there was any semblance of a quarrel, and described the assault as wholly unprovoked and unexpected.

The jury returned its verdict of murder in the first degree, and from a sentence pursuant thereto this appeal followed. That the evidence upon which the jury based its verdict is substantial none can doubt.

█ Five claims of error are relied upon by appellant in support of his demand for a new trial. The first is predicated upon the action of the trial court in permitting the physician who first examined the body of deceased to testify that she had been criminally assaulted over an objection that his answer would tend to show the commission of another crime. The objection is clearly untenable. The criminal assault was a concomitant part of the transaction which resulted in the slaying of deceased, and was admissible under one of the well-recognized exceptions to the general rule excluding proof of other independent crimes, both as tending to show motive for the homicide, and also as a part of the res

gestæ of the crime charged; or, as Mr. Wigmore prefers to denominate it, as "concomitant parts of the criminal act." 1 Wigmore on Evidence (2d Ed.) §§ 215–218; 4 Chamberlayne's Modern Law of Evidence, § 2588; Underhill's Criminal Evidence (3d Ed.) § 160; Territory v. Livingston, 13 N. M. 318, 84 P. 1021; State v. Graves, 21 N. M. 556, 157 P. 160; State v. Pino, 21 N. M. 660, 158 P. 131; State v. Riddle, 23 N. M. 600, 170 P. 62; State v. Starr, 24 N. M. 180, 173 P. 674; State v. Lazarovich, 27 N. M. 282, 200 P. 422; State v. Craemer, 12 Wash. 217, 40 P. 944; State v. Dooley, 89 Iowa, 584, 57 N. W. 414; People v. Wolter, 203 N. Y. 484, 97 N. E. 30; State v. McGowan, 66 Utah, 223, 241 P. 314.

The last three cases cited are instances where, in a prosecution for homicide, proof of criminal assault either upon the deceased or another was shown incident to proof of the res gestæ, or as relevant upon the question of motive.

■ Error is predicated upon the court's admission over objection of testimony of a state's witness that a car washer had been found under the bed of deceased. Defense counsel concedes that this evidence affords a suspicious circumstance in view of the fact that defendant was a garage employee. The particular objection here urged is that it was improper redirect examination. On cross-examination by defense counsel this witness was interrogated and made answers, as follows:

"Q. Did you present to the defendant at Albuquerque, present or show to him at Albuquerque a car washer? A. Yes, sir; I did.

"Q. Did you tell the defendant at Albuquerque that you found that car washer in Angelina's house? A. No, sir."

On redirect examination the following took place touching this incident, to wit:

"Q. There was some mention here of a car washer? A. Yes, sir.

"Q. It was suggested you may have shown it to Johnson at Albuquerque? A. Yes, sir.

"Q. Was there such a car washer?

"Mr. Crist: He denied it, if the court please.

"Mr. Kenney: No, he didn't deny the existence of the washer, he denied showing it to him in the manner which you had suggested.

"Mr. Crist: I object to the testimony, the witness denied showing it.

"The Court: Read the question. (Question read.)

"The Court: Overruled.

"Mr. Crist: Exception."

Thereupon the witness answered that there was such a car washer and that he found it under the bed of deceased. Defense counsel after such answer interpolated the following, to wit:

"Mr. Crist: I want my objection to go to all this testimony along that line, let the record show I object to any such testimony.

"The Court: The record will so show and the ruling is the same.

"Mr. Crist: Exception.

"Q. Who was with you when you found it? A. District Attorney J. J. Kenney."

It will be observed that the sole objection urged below was that the witness had denied showing the car washer to defendant—not that the interrogation concerning it was improper redirect examination. Thus the objection here urged was not called to the attention of the trial court. But, if the objection now presented be considered as having been made below, we are unable to see wherein its disallowance would disclose an abuse of that discretion with which a trial court is vested in controlling the course and extent of redirect examination. 40 Cyc. 2530. See, also, State v. Stewart, 34 N. M. 65, 70, 277 P. 22, and State v. McKnight, 21 N. M. 14, 37, 38, 153 P. 76.

■ Nor do we see error in the court's action in admitting in evidence the tube of lipstick. A lipstick and one other article of cosmetics of the kind shown to have been purchased by deceased on the day ·before the homicide were found in a dresser drawer in the bedroom of deceased's mother. It was "Kiss-Proof" lipstick, the kind deceased had purchased. When the tube of lipstick and a package of Peter Pan powder were exhibited to a witness on the stand, she identified them as two of the articles purchased by deceased in the witness' presence on the day before the homicide. We attach no particular weight to this identification in aid of admissibility, since no distinguishing marks were pointed out and any other purchases of the same articles bearing the identical trade-marks in packages of the same size would appear the same.

When asked what deceased did with these purchases, the witness answered that she placed them in the dresser drawer where found. She also stated that she directed the officers to the place from which the articles were removed. Interrogated by defense counsel, she admitted she did not actually see deceased place them in the drawer. The deceased, her mother, and a female cousin of deceased eleven years of age, who had seen deceased make the purchase, and is the witness just referred to, were the only female occupants of the household. Only deceased, of the three occupants, used lipstick.

The point to the objection is, of course, that, since deceased's cousin admitted not having seen deceased place the lipstick in the dresser drawer, there was a missing link in its identification. We are satisfied it was sufficiently identified to entitle it to admission. The possibility that it was not the same lipstick purchased and used by deceased on the afternoon preceding the homicide was remote to say the least. Certainly the jury was entitled to say whether it was the same.

■ The next claimed error was in the trial court's refusal to strike certain answers of the fingerprint expert, Powers. For a correct understanding of this ruling it is desirable to identify some of the exhibits employed in developing the fingerprint testimony. But, first, a word regarding the principal witnesses on this subject. They were Detective H. C. Martin of Santa Fé; J. H. McSparen, who took the photographs of the fingerprints from the fragments of a broken vase; R. E. Brunk,

a convict from the State Penitentiary in charge of fingerprint work therein; and F. J. Powers, superintendent of the bureau of criminal identification of the police department of El Paso, Tex. The exhibits hereinafter referred to are all state's exhibits.

Exhibit 1 was a fragment of the broken vase upon which as a result of the application by Detective Martin of fingerprint powder a questioned fingerprint of the right thumb was developed. Exhibit 20 was a photographer's negative of Exhibit 1; Exhibit 25, a contact·print of the negative, Exhibit 20; and Exhibit 29, a photographic enlargement of Exhibit 20, changed by a photographic process from a negative into a positive for purposes of comparison.

Exhibit 2 was another fragment of the broken vase upon which by a like application of fingerprint powder a questioned fingerprint of the left middle finger was developed. Exhibit 21 was a photographer's negative of Exhibit 2; Exhibit 24, a contact print of the negative, Exhibit 21; and Exhibit 26, a photographic enlargement of a print appearing on one portion of the Exhibit 21, likewise changed by a photographic process from a negative into a positive for purposes of comparison.

Exhibit 23 was an original set of defendant's fingerprint impressions taken by. the man in charge of fingerprint work at the State Penitentiary, the witness R. E. Brunk, on November 20, 1931, a few days following the homicide. Exhibit 27 was a photographic enlargement of the print of the left middle finger taken from Exhibit 23; and Exhibit 28, a photographic enlargement of the print of the right thumb taken from said Exhibit 23.

The expert, Powers, compared the questioned fingerprint of the left middle finger, Exhibit 26, found on a piece of the vase, Exhibit 2, with the photographic enlargement of defendant's left middle finger, Exhibit 27, directed attention to many points of comparison, and declared the two fingerprints to be identical. A like result followed his comparison of the questioned fingerprint of the right thumb, Exhibit 29, found on a fragment of the broken vase, Exhibit 1, with the photographic enlargement of the print of defendant's right thumb, Exhibit 28, photographed from Exhibit 23.

While the expert Powers was being questioned for purpose of identifying Exhibit 27, the photographic enlargement of defendant's left middle finger taken from Exhibit 23, in an answer he referred to this photographic enlargement, Exhibit 27, as "a photographic enlargement of left middle finger of the accused." And again, in referring to Exhibit 23, the witness designated it as "the set of finger print impressions of the accused." Defense counsel objected to these answers, and asked to have them withdrawn upon ·the ground that they involved an assumption by the witness that the original impressions from which the enlargements were made were fingerprints of the accused; that the assumption was hearsay testimony so far as this witness was concerned. A like objection was urged to the witness' designation of Exhibit

288

23 as a set of finger impressions "properly identified for comparison with the subject's finger prints."

If there had been any dispute about the genuineness of Exhibit 23 as furnishing a set of original fingerprints of the accused (the defendant), of course, it would have been improper for the witness to assume this fact in issue. But there was no issue upon this point. Exhibit 23 was identified by witness Brunk as containing original impressions of defendant's fingerprints taken by him at the penitentiary on November 20th. When offered in evidence, defense counsel first objected upon the ground that no proper foundation had been laid, and that the person who took the fingerprints had not properly connected the exhibit with the taking of defendant's fingerprints. After some argument, not appearing in the record, all protest against the introduction of the Exhibit was withdrawn, and it went into the record without objection.

The controversy raged, not over any question whether the fingerprints on Exhibit 23 were those of defendant, but over the identity of the person who made the fingerprints on Exhibits 1 and 2, the broken bits of a glass vase, found at the scene of the crime. Absent controversy over the genuineness of Exhibit 23, as defendant's original fingerprints, we see no error in having permitted the witness to assume in his answer, for the purpose of greater clarity before the jury, what was an undisputed and unopposed fact in the case.

The next and final claim of error is based upon the trial court's refusal of defendant's specially requested instruction on circumstantial evidence. The court in its general charge instructed upon this subject as follows: "10. By circumstantial evidence is meant the proof of such facts and circumstances connected with or surrounding the commission of the crime charged as tend to show the guilt or innocence of the party charged, and if these facts and circumstances are sufficient to satisfy the jury of the guilt of the defendant beyond a reasonable doubt, then such evidence is sufficient to authorize the jury in finding a verdict of guilty against him. But you are instructed that before you will be authorized to find a verdict of guilty against the defendant in this case, the facts and circumstances shown in evidence must be incompatible upon any reasonable hypothesis other than that of the guilt of the defendant."

The first sentence of the requested instruction is in the exact language of the first sentence of the given instruction. The given and the requested instruction differ only in the language in which the final sentence is couched; the concluding sentence of the requested instruction being as follows: "But the jury is further instructed that where circumstances alone are relied on by the prosecution for a conviction, they must be such as to exclude, beyond a reasonable doubt, every hypothesis or theory other than that defendant is guilty as charged, must be such as to apply exclusively to the defendant and

be irreconcilible with any other theory than his guilt, and they must satisfy the minds of the jury beyond a reasonable doubt."

The principal objection of defense counsel to the given instruction as compared with the one requested is that the former fails sufficiently to impress upon the jury's mind that the circumstances relied upon for conviction must exclude every hypothesis or theory other than that of the defendant's guilt. While counsel does not go so far as to assert that the word "exclude" must be employed in stating the rule, his argument clearly indicates his belief that it is dangerous to omit it. So, after all, our concern is to ascertain whether under the instruction as given, even though it may not represent the desired discrimination in the choice of words or the best grammatical construction, the jury received the substance and effect of the rule for testing the weight to be given facts and circumstances relied upon for conviction.

It is not necessary in charging the jury upon circumstantial evidence that the court employ any particular words or phrases. There is no prescribed formula for stating the rule. State v. Farris, 48 Idaho, 439, 282 P. 489, 491; State v. Blaine, 45 Mont. 482, 124 P. 516; Bosley v. State, 69 Tex. Cr. R. 100, 153 S. W. 878; Coffman v. State, 73 Tex. Cr. R. 295, 165 S. W. 939, 941.

"The rule is well established that in charging the jury upon circumstantial evidence the charge need not be couched in any particular set of words or phrases, and is sufficient provided it is correct in substance and is so expressed that from the entire charge the jury can readily comprehend the language employed. In other words, it is essential only that the language employed defines or explains circumstantial evidence and intelligently states the rule governing its effect." State v. Farris, supra.

"Judge White, in his Annotated Procedure, § 813, subd. 5, p. 532, correctly states: 'There is no prescribed formula for a charge on circumstantial evidence. Loggins v. State, 8 Tex. App. 434; Hubby v. State, 8 Tex. App. 597. If the ideas conveyed are correct, and so expressed as to be understood by the jury, the charge is sufficient. Chitister v. State, 33 Tex. Cr. R. 635 (28 S. W. 683); Ray v. State, 13 Tex. App. 51; Taylor v. State, 9 Tex. App. 100; Rye v. State, 8 Tex. App. 153; Simms v. State, 8 Tex. App. 230.'" Coffman v. State, supra.

In paragraph 12 of syllabus prepared by the court to the opinion written by the late Mr. Justice Parker in State v. Carabajal, 26 N. M. 384, 193 P. 406, 17 A. L. R. 1098, we said: "An instruction which merely lacks scientific form, while in substance it covers the matter fully, is not objectionable."

Guided by this rule for testing the sufficiency of a general charge upon circumstantial evidence and the strength of the conclusion to be entertained before basing a conviction thereon, we think the instruction given was not misleading, and in substance conveyed to the jury the correct idea for applying circumstantial evidence. In other words, in substance as said in State v. Smith,

32 N. M. 191, 252 P. 1003, 1007: "The jury was correctly instructed that, to warrant conviction, the circumstances must be such as to be incompatible upon any reasonable hypothesis with innocence of the defendant."

However, in the Smith Case, this abstract statement of the law was not deemed sufficient, since defendant had hypothesized in the evidence a theory of the commission of the offense charged by some one other than himself. We held this circumstance entitled defendant to a requested instruction applying the law to his theory of the case which there was evidence to support.

A very brief and concise instruction upon the probative value of circumstantial evidence and one which we believe fairly states the law, where an abstract statement of it is all that is required under the evidence, is to be found in Commonwealth v. Coontz, 288 Pa. 74, 135 A. 538, 540. The jury were instructed that, where defendant's conviction of an offense is dependent upon circumstantial evidence, "such evidence must be incompatible with his innocence of such charge upon any rational theory, and incapable of explanation upon any other reasonable hypothesis than that of guilt; otherwise the defendant should be acquitted of such charge."

A person who is discriminating in his choice of words might prefer to say that "such evidence must exclude every other reasonable hypothesis than that of guilt." We cannot doubt that both convey the same idea. In the case at bar the court told the

jury that, before they were authorized to convict, "the facts and circumstances shown in evidence must be incompatible upon any reasonable hypothesis other than that of the guilt of the defendant."

"Incompatible" is defined in Century Dictionary as "not compatible; incapable of harmonizing or agreeing; mutually repelling; incongruous."

"Things are incompatible when they cannot coexist, and * * * inconsistent when they are opposed to each other." Commonwealth v. Staunton Mut. Telephone Co., 134 Va. 291, 114 S. E. 600, 603.

Territory v. Padilla, 8 N. M. 510, 46 P. 346, and Territory v. Lermo, 8 N. M. 566, 46 P. 16, are two cases decided by the territorial Supreme Court involving, in the first, the sufficiency of the instruction given on circumstantial evidence, and, in the second, the failure after request to instruct at all. If we could accept the interpretation placed by defense counsel upon the language of the opinion in the Padilla Case, we should be forced to confess the holding subject to the criticism directed against it by him. To be specific, under his interpretation of the language employed (and it yields itself to such construction), the court holds the given instruction inadequate and not all defendant was entitled to, finds the requested instruction more nearly supplies the inadequacy present in the one given, and yet holds it not reversible error to refuse the requested instruction. We think, however, that the opinion fairly construed does no more than

to hold that the given instruction, while containing a statement of the rule sufficient to meet the requirements of law on the subject, and therefore not legally insufficient, might as a matter of discrimination in the choice of phraseology have had the thought to be conveyed more clearly expressed by substituting the language of the requested for that of the given instruction.

It should be remembered, too, that the Padilla Case was reversed on other grounds and a new trial awarded. Little doubt could have existed but that upon a retrial the defendant would have the benefit of the instruction requested and refused at the first trial. Furthermore, if we should accept defense counsel's interpretation of the language in the Padilla Case, here we find no such inadequacy in the given instruction as that interpretation must impute to the given instruction in the Padilla Case.

In the Lermo Case, the court's general charge having failed to give any instruction on circumstantial evidence, it was, of course, error to refuse defendant's request for one.

In so far as the requested instruction here involved told the jury that the facts and circumstances "must be such as apply exclusively to the defendant," there was nothing in the evidence pointing to or suggesting another as perpetrator of the crime. Touching upon a charge of this kind, the Supreme Court of Alabama, in Pitman v. State, 148 Ala. 612, 42 So. 993, 995, said: "In view of this conflict of opinion in our own decisions, we remark, first, that such a charge is not

proper at all, except in those cases where there is evidence pointing to one or more persons other than the defendant; second, it is not proper if the nature of the offense is such that both may have been guilty; third, if allowed at all, a 'theory' hypothesized should be a reasonable theory." See, also, Bowen v. State, 140 Ala. 65, 37 So. 233, and Owens v. State, 215 Ala. 42, 109 So. 109.

■ What we have said disposes of all claims of error predicated upon the record and embraced in points relied upon for reversal in the briefs filed on behalf of defendant. In oral argument, however, counsel for defense submits with great earnestness that to have brought his client to trial in early December, 1931, so close in point of time, upon the commission of a crime of the peculiar atrocity of this one, and in the very city where lay the scene of its commission, rendered it impossible for the defendant to have received a fair trial in the larger and truer meaning of that phrase. He argues that, no matter how damning or incriminating the evidence, a defendant asserting his innocence is entitled to trial by a jury selected in a vicinage free from the hot blood inevitably arising in a community which is the scene of such a crime.

The record before us furnishes no basis for this argument. It discloses no motion for change of venue. Counsel seeks to explain his reason for not filing one. But, with a record before us barren of any hint or suggestion that the occasion for a change of venue existed or that any explanation of

the failure to move for it was ever called to the attention of the trial court, it must be obvious to counsel that, under well-settled principles, we are in no position to consider the matter. The argument is all outside the record. Necessarily, cases must be decided in this court upon the record made below.

A careful study of the entire record fails to disclose error in the conduct of the trial. Defendant, represented both below and in this court by able counsel of long experience, appointed by the trial court, was convicted of a heinous crime and given the sentence prescribed by law. The judgment and sentence so pronounced must stand affirmed, and it is so ordered.

WATSON, C. J., and HUDSPETH, BICKLEY, and ZINN, JJ., concur.