237 P.2d 1033

**STATE v. FOLEY.**

No. 5361.

Supreme Court of New Mexico.

Nov. 29, 1951.

G. T. Watts, O. O. Askren, Roswell, for appellant.

Joe L. Martinez, Atty. Gen., Walter R. Kegel, Asst. Atty. Gen., for appellee.

SADLER, Justice.

The defendant was convicted of the crime of rape and prosecutes this appeal from the sentence pronounced upon him. The offense was charged to have been committed in the city of Roswell in Chaves County on June 15, 1950. The jury having returned a verdict of guilty after being duly instructed on the law of the case, it was within its province to believe the facts leading up to and in connection with commission of the offense charged were as they shall now be related.

The victim of the offense was a spinster of the city of Roswell, 46 years of age and a virgin. She was employed as a secretary

by a local business concern in Roswell and had been for some years. She resided alone in a three-room apartment, having as neighbors in nearby rental units some army officers and their wives with whom she maintained friendly relations as neighbors.

On the evening of June 15, 1950, at approximately 8:30 o'clock the prosecuting witness received a telephone call from a young man in his early twenties who inquired of her whether she believed in blind dates, to which she responded, "yes and no." At the time she thought it might be one of her neighbors or friends, some of whom were constantly teasing her about being an old maid and threatening to get a date for her. She dressed and inquired of one of her neighbors if perchance her husband might have put someone up to calling her but the neighbor did not think so, as she thought he had gone fishing. Still laboring under the impression that some of her friends had instigated the call and not wishing to be a "poor sport" about it, the prosecuting witness permitted defendant to call in view of his suggestion that they go dancing.

After talking with the neighbor, the prosecuting witness sat in a porch chair on her lawn and while there the defendant arrived and introduced himself as Harry "Frost," a fictitious name. She first asked him if any one of several friends had sent him, which he denied but when asked if Sergeant Bush, a neighbor, had sent him, he evaded the question. He had come by taxicab and immediately inquired if she had change for a $5 bill. She went into her apartment to ascertain whether she had the change and he followed her into the house. She did not have sufficient change, so he went out to pay the taxi driver and she returned to the porch chair. The defendant then came and sat on the footrest of the porch chair.

The two spent something like 20 to 30 minutes talking while she sat on the porch chair and he on its footrest. Then he suggested various places for dancing. Finally, they entered the house to call a cab, ostensibly to go dancing. After she had called the cab and turned from the telephone, he placed his arm around her and kissed her once or twice. This was going a little too fast to suit her and so she decided she would not go dancing with him. In the meantime she had attempted to find out who he was. He told her he was an engineer and that he was working for the Santa Fe Railroad and would be in Roswell for a while and would like to keep her as his friend. He apologized for his boldness and asked if he couldn't remain a while longer. The taxi which had been called having arrived in the meantime the defendant dismissed it, after paying the driver, and they returned to the yard to sit on the porch chair.

The two continued for a time to sit and converse on the porch chair, as previously, during which period the defendant took hold of her hand and attempted to kiss her again. Finally, and a short time later he asked if she had any coffee and they entered the apartment. He inquired if he might go to her bathroom, which she pointed out to him, and while he was closeted there she turned on the gas under a pot of coffee she had placed on the stove earlier with the intention of sharing it with some of her neighbors. As soon as the coffee was ready they entered the living room and sat together on a couch sipping their coffee.

While sitting thus engaged, the defendant inquired whether she had any dance records. She told him she did and, complying with his request, placed two of them on the phonograph to which they danced while the records were being played. Until this time, the defendant's demeanor and conduct, beyond causing a feeling on her part he was somewhat rude in attempting on such short notice to kiss and hold her hand, was not of a nature to frighten or alarm her. Because of this boldness, however, she decided it was best to have him leave. Accordingly, when the two dances were finished she told him it was getting late and that he had better leave. She moved toward the front door. The front entrance has two doors, the one which opens inside being a winter door. It was standing open toward the north and extended inside the room. The other was a screen door which opens outside and away from the house.

She began to move toward the door for the purpose of having him leave, and upon arrival awaited him there intending to close the door after him. Apparently, sensing this intention, immediately upon coming alongside her he seized and closed the winter door from the inside. When she attempted to open it, "he reached over and slammed the door shut" for the second time. As she renewed her effort to open the door, he seized her by the hair on the back of her head and "swung" her into the corner between the archway and the door by the floor furnace. This corner is in the front room of her apartment near the front door. There is the front door near which is a floor furnace, then the archway separates the dinette and the living room. It is a partition about one and one-half (1½) feet wide extending into the living room. There is no window near this corner into which he cast her and it is not within view of any of the windows in the house. They were open and without shades which were at the cleaners in preparation for arrival of company expected presently. What happened within the next few minutes can best be told in the words of the prosecuting witness herself. She testified:

"Q. How did you say the defendant took hold of you? A. He grabbed me by the

hair here (demonstrating), and took this arm and swung me sideways into the corner and he had me at an angle like this (demonstrating) so his arm and body was pressed against me here in the corner.

"Q. How did he hold you there? A. Very roughly.

"Q. What else did he do with his hands? A. With his other hand he drew it up into a fist and shoved it underneath my face and said if I made a cry or move that he would change my face so my friends would not recognize me.

"Q. What had he done with your head, if anything? A. He had such a strong hold on me on my hair and head and had my head bent down on my chest with his fist up in my face.

"Q. Could you move in any way in that position? A. No, sir, I could not.

"Q. Did the action of the defendant cause you any pain? A. Yes, sir, it hurt my head very much and it frightened me nearly to death.

"Q. You say he put his fist under your nose? A. Yes, sir.

"Q. At that time he had your body pressed up in the corner with his fist under your nose? A. Yes, sir, and he said if I made any cry he would change my face so none of my friends would recognize it.

"Q. What effect did that have upon you? A. It stunned me and scared me to death.

\* \* \* \* \* \*

"Q. What did the defendant do then? A. He pushed me toward the table over by the window where there was a light on, and with this hand he had underneath my nose, first he took this arm (demonstrating) and put it back here, and with that strong hold on my head pushed me over and told me to turn out the light.

\* \* \* \* \* \*

"Q. Had he said anything to you at that time? A. He just told me to turn the light out.

"Q. How much time had elapsed between the time he slammed the door and shoved you in the corner and told you to turn out the light? A. Not over three or four minutes I do not think; it was very fast.

"Q. Was it all one continuous action? A. Almost.

"Q. After you turned out the light, what did he then do? A. He pushed on me toward the dinette and I asked him what he was going to do and he said we were going to play a little bit.

"Q. At that time did he still have hold of your head? A. Yes, sir.

"Q. Was he forcing your head and arm down? A. Yes, sir.

"Q. Was it hurting you? A. Yes, sir.

"Q. Where did he shove you to? A. toward the bed room.

"Q. It was on the way there that he made the statement you were going to play a little bit? A. Yes, sir.

"Q. What kind of tone of voice did the defendant use? A. Roughly.

"Q. Did you try to get away from him at that time? A. No, sir, I was too frightened and terrified to think of anything to do; my mind was just a blank.

"Q. Was there any way you could have gotten away from him? A. No, sir, he was between me and the door, and my bed room window faces into a vacant lot, and any yell I might have gotten out no one would have known where it came from.

"Q. Could you have twisted away from him in the grasp he had on you? A. No, sir.

"Q. Where did he proceed to shove you? A. Toward the bedroom, and I told him on the way there I was not that kind of a girl.

"Q. What did he say to that? A. I do not remember."

Without going into greater detail on events transpiring immediately prior to commission of the offense charged, nor reciting beyond the necessities of the case the nauseating and revolting details directly connected with the offense, it is enough to state that defendant forced the unfortunate victim of his depravity into her bedroom where he compelled her to disrobe and lie down beside him on the bed while he disrobed. It was at this point that he compelled her to engage in an act called "fellatio" with him. Cf. State v. Murry, 136 La. 253, 66 So. 963. Due to her importunities and pleas he desisted and thereupon engaged in an act of sexual intercourse with her in a natural manner, without her consent and against her will.

Immediately following the completion of this act, in the commission of which the victim's hymen was ruptured and she began to hemorrhage badly, the defendant lay still for a short time and then arose from the bed and requested her to accompany him into the bathroom. He took a seat on the toilet and it was then she noticed there was blood over large portions of his body. He made her take a wash cloth and wipe the blood off him. When this was done, he informed his victim that he had a friend named Jack, outside the bathroom window taking pictures of all that might transpire within; that she would not wish her friends to see these pictures. He then forced her to engage in another act of fellatio with him. Throughout the entire period the victim of this crime was in fear of her life, not knowing at what moment, if she resisted,

she might be killed or, otherwise than already sorely harmed, suffer other grievous bodily injuries.

Following this act by defendant he asked his victim if she had $70. She informed him she had only her last salary check for $94.04. He forced her to endorse it and asked her if she knew where they could cash it. She told him she knew of no place except Pecos Valley Drug Store up town, to which he rejoined: "Any bar would cash a payroll check," adding, "Scavarda's would cash it." The following proceedings then occurred, to-wit:

"Q. What else occurred there in the bathroom?

"Mr. Watts:—We object to all this line of testimony.

"The Court:—And the objection is overruled.

"Mr. Watts:—We except.

"A. He had this wild glare in his eyes and it scared me to death, and he took the bath towel and the rag and told me to get up and get in the shower, and he had that bath towel between his two hands and upraised toward me (demonstrating) and backed me into the shower, and all I could think of was, 'This is it, he is going to kill me—

"Mr. Watts:—(out of the hearing of the jury) We object to any testimony with reference to any threats to attempt this prosecutrix subsequent to the commission of the alleged crime of rape for the reason the act has already been accomplished, and this act or threat against her subsequent to the act would be inadmissible to rely on in which to place this witness in peril.

"The Court:—Overruled.

"Mr. Watts:—We except.

"Q. Go ahead? A. And as I turned to go back in the shower I said, 'I will give you all the money I have; I will not say a word about it; what more can I do', and he just looked at me a few minutes and then turned on his heel and went into the bed room, and I just stood there and I heard him banging things in the bed room and just as I got to the bath room door he said 'get dressed.'

"Q. Did you get dressed? A. No, sir, he went to the bed room and I heard him moving around in there, and I looked at myself and I was bleeding quite badly, and I asked him if I could wash myself off and he said he did not care, and I heard him getting dressed and putting his clothes on, and he told me to get dressed, and I asked if I could put kotex on because I was bleeding so, and he said he did not care, and I asked him to throw in my clothes and he threw in my slip and bra and when I got that on I came out into the bed room and when I got in there he came in and followed me to where my dress

was laying and I picked up my dress and I saw the blood was on that and I did not have a belt and I asked him if I could get a belt and he said, 'Yes, but take the first one that comes to hand', so I did, and he came and he had my fountain pen and check in his hand and he told me to endorse it, and I did and I started to hand him the check, and he said, 'No, that is not the way I operate; you are going with me and cash that check', and he said, 'All I want is eighty dollars', and he said, 'In two days you will receive the pictures that were taken.'

"Q. Thereafter did you proceed with your dressing? A. Yes, sir.

"Q. What did you do then? A. He took hold of my arm and we went into the front room and he told me to call a cab.

"Q. Did you do that? A. Yes, sir.

"Q. What did you do while you were waiting for the cab? A. I sat on the couch and he sat in a chair in front of me, and he told me 'In a way I feel sorry for you and again I do not', and made some other remark I do not remember what it was. I was in such a daze all I wanted to do was to get rid of him.

"Q. Did the taxi arrive? A. Yes, sir.

"Q. Did you go out to the taxi? A. Yes, sir.

"Q. Why? A. Because I wanted to go and give him the money and get rid of him.

"Q. Were you still afraid of him? A. Yes, sir.

"Q. What were you afraid of? A. That if I did not he might kill me there and take the check anyway. I did not think I had any choice in the matter and I went with him because I wanted to get rid of him. I was so humiliated I did not want my friends or anybody to know.

"Q. Did you go with him then out to Scavarda's by taxicab? A. Yes, sir.

"Q. After you got to Scavarda's was there anybody around? A. No, sir. The taxi drove up to—I think there is a side door and it was locked and we went to the other door and there was a bar there and only the waitress was in there and nobody else."

As indicated in the testimony just quoted there was no one in the bar except a lone waitress. The defendant ordered drinks, he consuming his and the prosecuting witness leaving hers untouched. After the waitress cashed her check, the prosecuting witness handed eighty dollars to defendant. He would not take it while in the bar but instead pushed the hand holding the currency toward her purse into which she placed the money. Then taking her by the arm he escorted her from the bar

and into the waiting taxi which had brought them there. As soon as they were in the cab, he took from her eighty dollars of the proceeds of the check which had been placed in her purse, as already stated. Upon arrival at the apartment, he assisted her from the cab and accompanied her for about ten feet toward her apartment, informing her she would have to pay the cab fare. As she was about to do so, he suddenly announced that he would pay for it, saying: "Oh, no, give me the other ten dollar bill," which she did.

Enroute from the bar defendant had asked the taxi driver if he ever took passengers to Portales and upon being informed he did, the driver was directed to take him there when the prosecuting witness had been dropped at her apartment. Having obtained the ten dollars, in addition to the eighty dollars taken in the cab enroute to the apartment, in taking leave of his victim the defendant said: "Remember in two days you will get that picture and you will not want your friends to see it." To this, she responded: "No, I do not want anybody to know about this; do not worry."

While the prosecuting witness proceeded toward her apartment following defendant's departure, she began hemorrhaging badly and grew so weak she doubted her ability to make it to her own apartment. Just as she was passing Sergeant Bush's apartment enroute to her own, she observed a light still burning in his apartment and called out to him for help. He came to his back door, took her inside and placed her on a couch. He appraised the situation quickly after she had indicated something as to what had occurred and immediately called the police. When he suggested doing so, the prosecuting witness, still suffering from shock, fear and extreme humiliation at first demurred, not wanting "the police or anybody to know about it." It was now after midnight and other near friends, a husband and wife, were called in and the entire group went together to the office of a local physician who examined and treated her. She was in a state of near collapse from shock and exhaustion. The physician stopped the bleeding. He found her suffering from minor bruises, her clothing "all bloody" and her hymen disclosed a recent and severe rupture.

Before ending a recitation of the facts, it should be added that prior to the telephone call to the prosecuting witness earlier in the evening, the defendant had called for a taxi from the Nickson Hotel Lounge and had gone to Scavarda's bar, cafe and dance hall, also known as "Blue Moon Nite Club." A short time after his arrival there he was observed closeted in a telephone booth examining a telephone directory, glancing down the pages. Later, the telephone book from the booth occupied by defendant was examined and the section of the page con-

taining the listing of the name of the prosecuting witness had been torn from the book. Apparently, the defendant was looking for the listing of a telephone in the name of some female subscriber and came across that of the prosecuting witness. Although unessential that the exact means of his getting her name be established, the jury might very well have concluded that he simply took a telephone directory and turned its pages seeking the name of some female subscriber, apparently single.

It was on the facts outlined above that the jury brought in its verdict of guilty against the defendant, resulting in his sentence to the penitentiary, as aforesaid. Do these facts support a conviction of rape? This question presents the chief claim of error upon which defendant relies for a reversal. Accordingly, we shall first devote ourselves to resolving it before considering the second and only other claim of error raised and argued.

The first question is argued under defendant's assignments of error Nos. 1 and 2, both of which reduce themselves to a single claim of error, namely, that the trial court erred in denying his motion for an instructed verdict of acquittal interposed when the state rested its case in chief. Following denial of the motion counsel for the defendant announced he would stand on the ruling and put on no evidence. Thus the case went to the jury on the evidence of the state alone. Accordingly, we have squarely presented the sufficiency of the state's evidence to sustain a conviction of rape.

Although counsel here representing the defendant, only one of whom, G. T. Watts, Esquire, appeared for him below, have ably argued that the facts show consent by the prosecuting witness, the same argument no doubt was made to the jury at the trial and it failed to create a reasonable doubt of defendant's guilt. Likewise, it has failed to satisfy us there is such inherent improbability in the story of the prosecuting witness as told from the witness stand as to render it unworthy of belief. State v. Sanders, 54 N.M. 369, 225 P.2d. 150. See, also, Territory v. Edie, 6 N.M. 555, 30 P. 851.

■ The argument of the facts rests primarily upon two contentions (1) that the prosecuting witness made no outcry, nor availed herself of the first opportunity to complain to others; (2) that but for excessive hemorrhaging on the part of the victim, necessitating the calling in of aid, commission of the offense would have gone unreported. Standing alone and without the explanation afforded by the circumstances with which these facts are surrounded, the defendant would occupy an invulnerable position in support of his claim to a directed verdict. It is weighing the deadly implications of the two facts

mentioned in the spotlight of those surrounding circumstances that must test the verdict for the substantial support required to uphold it. So viewed and as already indicated, we are unable to say the jury went outside its province in appraising the evidence as it did.

It is to be remembered that the defendant's conduct and demeanor underwent a violent transformation as the prosecuting witness stood holding open the front door for his departure. Twice taking the door from her hand as she held it open and "slamming it shut," he suddenly siezed her by the hair at the back of her head and with her hair in his hand, her head shoved down on her chest and one arm in what is commonly known as a hammerlock, he sought to forestall an outcry by virtually threatening to commit mayhem on her in such a mutilation of her face that her friends would not recognize her, if she made an outcry or even so much as a move. However, it was not until he began forcing her toward the bedroom that defendant first disclosed to her his unholy purpose. When he did so, the two were at a point in the apartment where the only window through which a cry for help might reach outsiders opened on a vacant lot and would have brought no help. People v. Rich, 237 Mich. 481, 212 N.W. 105.

The failure to make an outcry does not raise a presumption as a matter of law that no outrage was committed. 44 A.J. 966, § 103 under topic "Rape"; State v. Ellison, 19 N.M. 428, 144 P. 10. If the victim is too terrorized through fear for her life or of the infliction of great bodily harm, the failure to do so loses its significance. Here the threat to do great bodily harm had been made. The victim testified that she feared for her life. The tendency of rapists with their passions aroused to slay their victims when enraged by resistence is common knowledge. We cannot say the jury misinterpreted the facts in attributing to fear the failure to make an outcry.

No doubt the jury, too, considered the probabilities in finding the prosecuting witness did not consent. Here was a woman of middle age who had passed through her girlhood and young womanhood and now was at the period in her life known as the mid-forties. Throughout she had remained chaste and a virgin. The jurors were entitled to consider along with all other pertinent evidence, whether it was likely that she would suddenly let unbridled passion rear its ugly head and move her to engage voluntarily in an act of sexual intercourse with a young man far enough her junior to be a son and that, too, upon an acquaintanceship of little more than an hour. Cf. State v. Sanders, supra.

It is true that she had permitted him to kiss her and hold her hand without dis-

playing the indignation which might have been expected. At the time of these indiscretions, however, she still was under the impression her caller had telephoned her at the instigation of some of her friends, an impression he obviously had sensed and aided in confirming in her mind by evading an answer to the question whether a friend named by her had done so. But, granting she was indiscreet in the respects mentioned, her chastity and virtue do not become forfeit by reason thereof, nor do such indiscretions make a young woman committing them legitimate prey for the rapist.

Still another consideration no doubt helped the jury to the finding that there was no consent. It will be recalled that the act of intercourse with the prosecuting witness in the natural manner took place after the defendant had compelled her to engage with him in a sordid act of the most disgusting and debasing character. This naturally would arouse in her the most intense hatred and disgust for him. The jurors may very well have asked themselves whether the victim of such an atrocious act of depravity could or would voluntarily yield her body to him in normal sexual intercourse. If they did so inquire, their verdict supplies the answer.

Counsel for defendant in argument lay stress on the fact that the victim of this offense at first objected to calling the police. Consideration of this argument brings up the second point or claim of error relied upon for reversal, namely, the admission in evidence of the so-called bathroom scene. Following rape of the victim in the bedroom, she was taken into the bathroom where another act of fellatio was committed in which she was compelled to engage as a participant. While this act was taking place, the defendant perpetrated on her as cruel and diabolical a hoax as was ever conceived by the mind of man. He led her to believe that a friend named, Jack, was outside the lighted bathroom window taking pictures of him and her, apparently as a willing participant, in the disgusting act mentioned. His main purpose was obvious and it worked for a short time. He sought to seal her lips and clamp a cloak of secrecy upon the events of the night. He informed her that as soon as the picture was developed she could have it and the film for the eighty dollars he demanded and later received along with ten more from her pay check.

Can anyone imagine a more powerful and compelling factor in sealing the lips of this victim of his passions than for the defendant to unfold to her this diabolical hoax as the truth? Is it surprising that she did not report him to the driver of the taxicab which took them to the Blue Moon Nite Club? Or that she failed to make known to the lone waitress encountered in the bar at that club the terrible.

experiences through which she had just passed? It is now quite understandable why she demurred when her neighbor, Sergeant Bush, first suggested calling the police. The fear of exposure on a film of the disgusting act into which defendant had forced her dethroned reason and explains her every act from that time until the terrible hoax perpetrated was exposed.

 We think there was no error in admitting testimony of the bathroom scene upon the ground that it let in evidence of an independent crime calculated to prejudice the jury against the defendant. On that score alone, it would be harmless error, if error at all, since testimony of defendant's first act of fellatio, immediately preceding the crime of rape, was already before the jury and properly so, as his counsel concede. The thing itself is so reprehensible and disgusting that all the prejudice to arise emerges from a single act, since that act alone brands him who voluntarily commits it as a sexual pervert.

■ But it was not error to admit the bathroom scene for two reasons. (1) It was so connected with the commission of the crime charged in time and sequence as to become a concomitant part thereof and otherwise meet the requirements for admission of such evidence as laid down and approved in State v. Johnson, 37 N.M. 280, 21 P.2d 813, 89 A.L.R. 1368. (2) It was competent and relevant as explana-

tory of the failure by the victim to report the offense charged at the earliest opportunity.

It is our conclusion that the defendant had a fair trial and the judgment of conviction pronounced upon him should be affirmed.

It is so ordered.

LUJAN, C. J., and McGHEE and COMPTON, JJ., concur.

COORS, J., being absent, did not participate.