424 P.2d 402

**STATE of New Mexico, Plaintiff-Appellee,**

**v.**

**Eddie Lee WHITE, Defendant-Appellant.**

**No. 8143.**

Supreme Court of New Mexico.
Jan. 23, 1967.

Rehearing Denied March 9, 1967.

Smith, Smith & Tharp, Clovis, for appellant.

Boston E. Witt, Atty. Gen., Myles E. Flint, Asst. Atty. Gen., Santa Fe, for appellee.

## OPINION

COMPTON, Justice.

Defendant, on a change of venue from Curry County to Quay County, was convicted of the crime of rape and, from the judgment imposing sentence, he appeals.

The defendant first complains that his constitutional rights were violated because of unreasonable delay in taking him before a magistrate. On August 3, 1965, at approximately 5:17 p. m., defendant was ar-

rested on the streets of Clovis, New Mexico. He was taken directly to the city hall where he was immediately informed of his constitutional rights. After being so informed, defendant attempted to arrange for the services of an attorney by telephone. The time of day being after the normal business hours, the defendant was unable to locate the desired attorney. At approximately 5:32 p. m., after he had attempted to engage legal counsel, defendant was taken by automobile to the Clovis hospital, where the prosecutrix had been taken. There, the prosecutrix identified the defendant as her assailant. As the police officers and the defendant left the hospital, at approximately 5:37 p. m., an officer called by radio and arranged to have a justice of the peace come to the city hall. The justice of the peace arrived at the city hall at 5:41 p. m., and defendant was immediately taken before him for arraignment. He was then given sufficient time to procure counsel of his choice before further proceedings were had.

▆ The defendant while recognizing that the time lapse between arrest and appearance before the magistrate, 30 minutes at most, is a relatively short period of time, nevertheless, argues that under the circumstances the delay was unreasonable because without legal counsel defendant was presented singly before the prosecuting witness and without the benefit of a line-up. This line of reasoning must be rejected; the process was then in its investigatory stage. No confession nor any exculpatory or inculpatory statements were made by defendant, nor does it appear that defendant was ever interrogated without his counsel being present.

▆ Some reference has been made to Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, as having announced new principles concerning the right to counsel. Even if the principles announced there were applicable to the facts of this case, defendant is in no position to rely on Miranda as that case has been held to apply to cases where the trial began after June 13, 1966. Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882. In Miranda v. State of Arizona, supra, it was stated that the principles announced there dealt with the protection of the privilege against self-incrimination.

We fail to see how defendant would benefit even if we were to apply Miranda retrospectively, which the states are free to do. Johnson v. State of New Jersey, supra. In Kennedy v. United States, (1965) 122 U.S.App.D.C. 291, 353 F.2d 462, the court ruled that Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, did not require exclusion of identification evidence obtained in absence of counsel.

■ The act of allowing the prosecutrix to view the defendant for the purpose of identifying him did not violate his constitutional privilege against self-incrimination. United States ex rel. Stovall v. Denno, (2nd Cir. 1966) 355 F.2d 731; Kennedy v. United States, supra; Copeland v. United States, (1965) 120 U.S.App.D.C. 5, 343 F.2d 287; and Caldwell v. United States, (8th Cir. 1964) 338 F.2d 385. See, also, 8 Wigmore, Evidence, McNaughton Rev., § 2265. We note, however, that in Wade v. United States, (5th Cir. 1966) 358 F.2d 557, while holding the accused to be entitled to counsel during the identification process, the court looked to see if the accused had been prejudiced by lack of counsel. It was held, under the particular facts of that case, that the identification process was unfair and that legal representation might have prevented the unfairness. The elements that the court found to be unfair in Wade are not found in this case. The case most factually similar to the present case is United States ex rel. Stovall v. Denno, supra. There the accused was identified by his victim at the hospital without a lineup. The court said:

"If Stovall had had counsel, what could counsel have done to thwart the identification? He could not have demanded Stovall's immediate release so that no one might see him. He could not have arranged to have Stovall continuously wear a hood or mask over his face to avoid identification, nor could he have ordered the police forthwith to halt their identification activities. * * *" Accord, see Kennedy v. United States, supra.

■ Defendant argues that his identification without having been placed in a lineup constituted a denial of due proceess. In Kennedy v. United States, supra, the court specifically held, "An accused has no right to be viewed in a lineup rather than singly." In United States ex rel. Stovall v. Denno, supra, the court, discussing numerous authorities, held that the method used went only to the weight of the evidence, not to its admissibility. We do not find the identification procedure unfair or a denial of due process.

We conclude that there was no unreasonable delay in bringing defendant before a magistrate. Compare State v. Barreras, 64 N.M. 300, 328 P.2d 74.

■ The defendant complains of eight articles appearing in the local Clovis newspaper in which it was revealed that the defendant had just been paroled from prison, thus preventing him from receiving a fair trial in Curry County. Specifically, he claims error in the refusal of the court to grant a continuance in Curry County for the term as a result of such publications. We see no error in this regard. The court recognizing that defendant's rights possibly had been violated, indicated he

would grant a continuance, but not for the full term. Instead of standing on his motion for a continuance for the full term, defendant stipulated to a change of venue. Having agreed to a change of venue, he waived any right he may have had to insist on a continuance of the case in Curry County. A change of venue is an effective means of overcoming local bias and prejudice. See State v. Alaniz, 55 N.M. 312, 232 P.2d 982, and Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600.

■ Defendant makes the argument that the record is void of evidence that the prosecutrix and defendant were not husband and wife at the time of the crime. We disagree. Prosecutrix's testimony reveals that she was married at the time of trial and had been married once previously. She gave the names of both husbands and the defendant was not one of those named.

Defendant also attacks the verdict as not being supported by the evidence. He argues that the prosecutrix's testimony is inherently improbable, and that the surrounding facts and circumstances do not corroborate her testimony, citing State v. Clevenger, 27 N.M. 466, 202 P. 687. Summarizing prosecutrix's testimony, it appears she had been divorced earlier in the year from her first husband, and on August 3, 1965 was sharing living quarters in Clovis with her sister and the sister's young child. Neither the sister nor the child was at home on the day of the attack. By relating the time of day to certain television programs that she usually watched, prosecutrix estimated that at about 3 o'clock that afternoon she washed various articles of clothing and went outdoors into the backyard to hang them out. After returning to the house, she went into the kitchen and began preparing a meal. She remained there until about 4:00 p. m., and then had occasion to walk into the bedroom. She heard a noise in the bedroom clothes closet and thought it was her kitten. She went to the closet to get the kitten and, instead, the defendant, a total stranger, stepped out and grabbed her. She testified:

"A. * * * we were still struggling and I was screaming and he grabbed, he had me by the neck and he started choking me to death and he said that if I didn't quit screaming he would go ahead and kill me and he had me pinned to the floor and he started ripping my clothes off of me."

At another point she testified:

"Q. Was he applying pressure to your neck?

A. Very definite pressure, I was about to black out and my tongue was sticking out."

Defendant, after ripping away prosecutrix's clothes, lifted her onto the bed from the floor where the struggle had taken

them. Prosecutrix was turned on her face and, while holding a "death grip" on her throat with one arm, defendant, "being very brutal about it," made penetration with prosecutrix lying beneath him. She then related the subsequent events:

"Q. Then, what happened next?

A. Then he got off of me and he wanted me to do it with my hands.

Q. How did you know that he wanted you to do it?

A. He told me.

Q. And did you do so?

A. Yes.

Q. Why?

A. I was scared to death not to do it, I was afraid he would go ahead and kill me, he had almost choked me to death two times before that.

Q. Did you notice anything unusual about him at that time?

A. He was bleeding profusely from his private part.

Q. Did any of the blood get on you?

A. Yes, it was all over my body, my hands and arms and legs.

Q. And after he made you do that, what then happened next?

A. The telephone rang and I told him it was my husband calling and that he knew I was there and if I didn't answer it he would know something was wrong so he let me answer it.

Q. Where was the telephone located?

A. It was in the living room.

Q. And you went in to answer the phone?

A. Yes.

Q. What, if anything, did defendant do?

A. Well, he held on to me all the way and he told me not to say anything or to give him away or he would kill me.

Q. Did you have any clothing on at that time?

A. No, sir.

Q. Did you then answer the phone?

A. Yes, I answered it and it was my little sister calling from beauty school.

\* \* \* \* \* \*

Q. And when you were having the conversation with your sister, where was the defendant?

A. He was standing about a foot away from me."

The sister asked prosecutrix to pick her up, and prosecutrix assured her she would in "about a minute." The prosecutrix went into the bedroom and the defendant began dressing to leave. She testified:

"Q. And after you went back in the bedroom, after answering the phone, did he say anything to you?

A. He told me, he asked me was I going to tell anybody and I said, 'No,' I was desperate to get rid of him, I saw he was fixing to leave or might go ahead and leave without harming me further and I was assuring him I would not tell.

\* \* \* \* \* \*

Q. Did he dress completely?

A. No, his T-shirt had blood all over it so he took that off and asked me if I would get rid of it for him and he put his long sleeved white shirt back on and his shoes and left.

Q. Did you tell him whether or not you would get rid of the shirt for him?

A. Yes, I had pulled the covers off the bed and hoping to convince him that I was not going to tell anyone, that I would get rid of everything and no one would know so he wouldn't hurt me any more."

Defendant left soon thereafter, and the prosecutrix put on a robe and drove by car to pick up her sister. Upon meeting the sister, prosecutrix began to cry and became hysterical. She related to her what had happened, and the sister then drove back to the house where they called the police. Soon after arrival of the police, the pros-ecutrix was taken to the hospital where she was examined by a doctor.

■ Defendant's contention ignores other strong corroborative evidence. The prosecutrix's slacks were torn. The buttons on a new blouse had been torn away, and her brassiere had been ripped. The prosecutrix suffered a scratch or cut on the side of her head, which bled during the preliminary hearing. Also, various witnesses testified that immediately after the assault they noticed red welts, or marks, on prosecutrix's throat. Police officers testified that the bedroom was in disarray. This evidence is inconsistent with sexual intercourse by consent. Compare State v. Maestas, 76 N.M. 215, 413 P.2d 694; State v. Ramirez, 70 N.M. 54, 369 P.2d 973; State v. Shouse, 57 N.M. 701, 262 P.2d 984; State v. Foley, 55 N.M. 590, 237 P.2d 1033; and State v. Sanders, 54 N.M. 369, 225 P.2d 150.

■ The defendant argues that the position of the parties when penetration occurred, and the fact he was not scratched by prosecutrix, is inconsistent with resistance. We reject that contention readily. The defendant had been brutal, had threatened his victim with death, and she feared for her life, she explains, "I was afraid to scratch him, I thought that would only infuriate him into killing me." The books are replete with cases holding that the amount of resistance required of the complaining witness depends upon the facts of

the particular case. Resistance may be overcome by fear induced by threats as by physical violence. State v. Foley, supra; State v. Cook, (1966), 242 Or. 509, 411 P.2d 78; State v. Kahunahana, 48 Haw. 384, 402 P.2d 679; and People v. James, 62 Ill.App. 2d 225, 210 N.E.2d 804.

Defendant argues that it is highly improbable that prosecutrix would drive to pick up her sister before calling the police had she been forcibly raped. The prosecutrix had this explanation: " * * * I was under shock and I was humiliated and felt degraded and was on the verge of hysterics and I wasn't thinking clearly at all."

 On the other hand there is evidence that the bedroom windows were open when the offense occurred. A neighbor couple, occupying a house situated very close to the house occupied by the prosecutrix, testified that they did not hear prosecutrix scream, however, the couple were the parents of a young child, and an air conditioner was running in their window at the time. It was the jury's function to judge the credibility of the witnesses and the weight to be given their testimony. State v. Nuttall, 51 N.M. 196, 181 P.2d 808.

 Finally, the defendant claims the trial court erred in refusing to give certain instructions requested by him. We find no error. The court's instructions fully covered the law of the case and the requested instructions tended to unduly emphasize the defendant's theory of the case.

 We conclude that the defendant was given a fair trial and that the verdict has ample support in the evidence.

The judgment should be affirmed, and it is so ordered.

NOBLE, J., and SPIESS, J., Court of Appeals, concur.