Irving E. SEYLE, Appellant (Defendant below),

v.

The STATE of Wyoming, Appellee (Plaintiff below).

No. 4871.

Supreme Court of Wyoming.

Sept. 29, 1978.

James H. Barrett, of Trierweiler, Bayless, Mockler, Barrett & McCartney, Cheyenne, for appellant.

V. Frank Mendicino, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Crim. Div. and Allen C. Johnson, Asst. Atty. Gen., Cheyenne, for appellee.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

ROSE, Justice.

Defendant Seyle, charged with first-degree murder, was convicted by a jury of manslaughter in connection with the death of his two-year-old stepson. On appeal he urges (1) the trial court erred in admitting photographs of the deceased; (2) the evidence was insufficient to sustain the conviction; and (3) the prosecutor committed plain and reversible error by commenting upon the failure of defendant's wife to testify. We will affirm the conviction.

Defendant's stepson died as a result of a brain injury occasioned by a broad-based blow to the head. Seyle testified that on the morning of January 29, 1977, the child had urinated in his pants and, for this, he hit the youngster on the buttocks with a belt, put him on the toilet, and then made him stand facing a doorjamb. The defendant said that the child turned pale and fell backward, hitting the right side of his head on the floor. Seyle related this series of events to the ambulance driver, to the attending physician, to a military police officer, and to the jury.

The attending physician testified that upon examining the child after death he noticed two-to-three-day-old bruises on the child's left forehead, his neck and behind each ear. He also noticed multiple bruises on the back of the little boy's legs and buttocks. He did not see the bruise on the right, rear portion of the head but, from a reading of the autopsy report, opined that this bruise caused the brain injury. He observed that the child, whose height was two-and-one-half feet, would have had to have fallen at least four to five feet to have sustained the reported brain injury. According to the physician, the head injury was comparable to hitting one's head against a solid wall at a speed of thirty-five to forty miles per hour.

The doctor performing the autopsy testified to the presence of multiple bruises and abrasions to the child's head, arms, chest, legs, back and buttocks. A two-inch-in-diameter bruise was found on the right, rear portion of the boy's head. According to the doctor, it could have been related to a fall only if there had been a broad area of contact.

During the course of the trial, nine photographs of the deceased child were offered. Eight of these exhibits were admitted into evidence, four of which were taken on the date of death at the hospital, while the remaining pictures were taken the following day after the autopsy and embalming. The subject of these photographs will be further examined in our discussion of the defendant's first issue.

An individual who rented a room in the home of the defendant and his family testified that an hour prior to the incident he noticed bruises on the child's forehead and face, but they were not as numerous as those disclosed by the photographs. After the roomer left the premises at 10 a. m., the defendant returned home from work. The defendant's wife did not testify, but the defendant testified that his wife was in the bathroom at the time of the incident. Finally, a fellow-worker of the defendant testified that some time in January, 1977, the defendant had stated, "that if the baby wouldn't be potty trained, he would beat him to death."

## ADMISSION OF PHOTOGRAPHS

Defendant argues that the probative value, if any, of the photographs admitted into evidence was outweighed by their prejudicial and inflammatory effect. The photographs, according to the defendant, had no relationship with the cause of the child's death and were inaccurate in several respects.

 The question of admissibility of photographs is left generally to the reasonable discretion of the trial court. *Dickey v. State*, Wyo., 444 P.2d 373, 377 (1968). Photographs are admissible if they correctly portray the subject matter, do not convey false impressions, and if their probative value is such as to outweigh the possibility of undue prejudice from such circumstances as—for example—their gruesome character. *Reeder v. State*, Wyo., 515 P.2d 969, 973 (1973). Since the prosecution has the burden of proving all elements of a crime, relevant photographs do not become inadmissible when the defendant concedes the fact and cause of the victim's death. *State v. Henson*, 221 Kan. 635, 562 P.2d 51, 62 (1977). See, *State v. Lantzer*, 55 Wyo. 230, 99 P.2d 73, 78 (1940). Photographs may be admitted in the trial court's discretion even where changes in the object photographed have occurred between the time of the incident in question and the taking of the picture, so long as the nature of the changed conditions is sufficiently explained to the jury. *State v. Tafoya*, 104 Ariz. 424, 454 P.2d 569, 572 (1969). Such changes do not necessarily affect admissibility; they usually affect only the weight to be given to the photographs by the jury. *State v. Rogers*, Mo.App., 523 S.W.2d 344, 347 (1975).

 Here, the photographs admitted into evidence are not more gruesome than would be expected, given the subject of the photograph and all of the attendant circumstances. They picture a dead child's body bearing multiple bruises and abrasions, and there is no way to make anything but sad-

ness out of such a vision. While it is true that the expert testimony related the cause of death only to certain bruises on the child's head, the remaining injuries potentially gave rise to an inference of a pattern of child abuse. This evidence, when coupled with other testimony touching the defendant's attitude toward the child's toilet training, furnished proof of the defendant's actions and intentions on the date of death. This supplies the requisite probative value. *Reeder v. State*, supra.

The coloration of the bruises shown in some of the photographs is admittedly different from the color observed by the various witnesses. The extent of this difference was, however, fully explained by the witnesses who took the pictures or who observed the child. Under these conditions, there was no error in admitting the photographs into evidence.

## SUFFICIENCY OF THE EVIDENCE

■ Defendant argues that the evidence failed to prove that he struck the fatal blow, or did so upon a sudden heat of passion or as a result of culpable negligence. A similar argument was made recently in *Jones v. State*, Wyo., 580 P.2d 1150 (1978), and is likely to arise in other similar cases. Because of the circumstances which ordinarily accompany the offense, the State's case must usually be based on circumstantial evidence. Such evidence, however, may, indeed, be sufficient to prove the criminal agency of the defendant. *Jones v. State*, supra. As in *Jones*, the extent of the bruising related to death was not observed prior to the time when the defendant admittedly came into exclusive control over the child. Expert testimony indicated that the head injury was not consistent with the defendant's explanation of the child's collapsing. From these circumstances, the jury could have reasonably inferred that the defendant struck the fatal blow with the requisite criminal intent. *Jones v. State*, supra.

## PROSECUTORIAL ERROR

■ Defendant argues that the prosecuting attorney committed plain and reversible error during closing argument by commenting upon the failure of the defendant's wife to testify.[1] No objection was made to these comments at trial, and the issue is raised for the first time on appeal. If defendant's argument is to be sustained, it must satisfy the plain-error doctrine. *Jones v. State*, supra. In order for the doctrine to apply, there must be a transgression of a clear and unequivocal rule of law, in a clear and obvious way, which adversely affects a substantial right. *Hampton v. State*, Wyo., 558 P.2d 504, 507 (1977).

Our discussion of this issue must be separated into two considerations: first, wheth-

---

1. The relevant portion of the prosecutor's argument is as follows:

"Let's talk about the mother for a little bit. The natural instincts of a mother—the love that a mother has for a child—I sometimes think it's more deep rooted than the father's love—although I can't say that I fit within that category. But, there is an instinct, if nothing else, a natural depth that the mother has in the love of her child, a child born of her body. What kind of a mother are we dealing with in this instance? I suppose you are curious, where is the mother? She didn't take the stand. Well, did she abuse the child? We have no evidence of that. Even the defendant said she never abused the child. She was good to the child. But, we have two witnesses, Mr. Horn and Mrs. Horn, telling you that this mother stood idly by when this child was forced to sit on the toilet hours at a time, was spanked several times a day, according to Mrs. Horn, and was made to stand. Is this a normal mother—a normal reaction on the part of a mother, or are we dealing with normal people? Apparently, this misguided woman was so infatuated with this new found boyfriend, and then husband of just a few weeks, that she sacrificed her child. She wouldn't stand up to this man who was abusing her child and stop him. Never did. The child ended up dead. Then it's too late. But the mother is still sticking up for him. She's never told us the story of what happened. I speculate she didn't want to get on this witness stand, when I started cross-examining her as to why she would stand idly by and permit these things to be done to this child. It puts a mother in a pretty difficult position, because there is no explanation—it's not normal. So, are we dealing with a normal mother? I submit to you, we are not."

er there was an improper comment upon the failure to call the wife and, more particularly, on an exercise of the marital privilege set forth in § 1–142, W.S.1957, 1975 Cum.Supp.[2] [§ 1–12–104, W.S.1977]; and second, whether the prosecutor improperly speculated as to what the wife's testimony would have been had she testified.

Unlike *Courtney v. United States*, 9 Cir. 1968, 390 F.2d 521, cert. den. 393 U.S. 857, 89 S.Ct. 98, 21 L.Ed.2d 126, cited by the defendant, here, there was no express exercise of the marital privilege not to have defendant's wife testify against him. Neither the State nor the defendant called the wife to take the stand. Assuming, arguendo, that the wife had been called to take the stand against her husband, there would have been no privilege precluding her testimony. In *Chamberlain v. State*, Wyo., 348 P.2d 280 (1960), we held that it is within the purview of our statute [§ 1–142, supra] that the wife be permitted to testify where she has suffered a special, particular and personal wrong through the rapacious assault upon her child. We reasoned that cases in which there is a wrong against the child of the wife fall within the § 1–142 exception applicable to "criminal proceedings for a crime committed by one [spouse] against the other" (bracketed material supplied), because the wrong affecting the wife is different from that suffered by the public in general. Here, the offense charged was the murder of the wife's child, but the reasoning is equally, if not more, applicable. If we abandoned the construction placed on § 1–142, supra, in *Chamberlain,* we would encourage defendants to silence their spouses in child-abuse or child-homicide cases. This is not the policy of this State. See, § 14–2–121, W.S.1977, expressly abrogating any privilege between husband and wife in child-abuse cases.

Since the wife could have testified for or against the defendant, her status was that of any other witness. She was equally available to the defense and the prosecution. Compare, *State v. Spears*, 76 Wyo. 82, 300 P.2d 551 (1956), holding that where a wife is a competent witness in behalf of her husband, but is not available to the prosecution, it is proper to comment upon the defendant's failure to produce her as a witness. Generally, the failure of either party to call a witness equally accessible to both is not a proper subject of comment. 23A C.J.S. Criminal Law § 1099, at p. 175. The State concedes this point, but argues for an exception in cases where the failure to use a witness more naturally leads to an inference against the defendant.

We agree with the thrust of this exception, and conclude that where the wife of a defendant in a criminal case, like that now before us, might be a material witness, and she is not placed on the stand by the defendant, it is permissible for the State in argument to infer that the absent testimony would have been both material and damaging. *Hilyard v. State*, 90 Okl.Cr. 435, 214 P.2d 953 (1950); and *Fisher v. State*, Tex.Cr.App., 511 S.W.2d 506 (1974).

Here, there was no marital privilege, precluding the wife's testimony against the defendant, which could be infringed by the prosecutor's comments. Neither can the prosecutor's comments on the wife's failure to testify be condemned since the testimony of this witness was available to both sides. The defendant testified that the wife inflicted the injury to the child's right cheek. The natural inference from this evidence is that the wife's testimony would have been material at least in some respect. Under such circumstances, the prosecutor's comment on the wife's failure to testify did not transgress an unequivocal rule of law, and there was, therefore, no plain error.

2. Section 1–142, W.S.1957, 1975 Cum.Supp., provided:

"In no case shall the husband or wife be a witness against the other, except in criminal proceedings for a crime committed by one against the other, or in a civil action or proceeding by one against the other, or an action brought by the husband for criminal conversation with or seduction of his wife, or in an action brought by either husband or wife for the alienation of the other's affections; but they may in all civil and criminal cases be witnesses for each other the same as though the marital relation did not exist."

Defendant argues that the prosecutor's remarks went beyond a mere comment on the wife's failure to testify, and included speculation as to what the wife's testimony would have been had she taken the stand. While a prosecutor may infer in argument that the absent testimony would have been material and damaging to the defendant, he may not go further by suggesting the content of such testimony. *Fisher v. State*, supra; *Robinson v. State*, Okl.Cr., 489 P.2d 1358 (1971); and *Asberry v. State*, Okl.Cr., 564 P.2d 648 (1977). Since the wife did not testify, there is no basis in the evidence to suggest what the wife would have said had she testified. Here, the prosecutor stated that the defendant's wife was "still sticking up for him" and suggested that she didn't take the stand because she didn't want to have to say "why she would stand idly by and permit these things to be done to this child." Unlike the comments made in *Robinson v. State*, supra, the prosecutor did not tell the jury that her testimony would have been contrary to the defendant's story. He did infer that her absence indicated her continuing support for the defendant. Such conduct has been criticized by this court. *Valerio v. State*, Wyo., 527 P.2d 154, 157 (1974), citing § 5.8(a), American Bar Association Standards for Criminal Justice, "The Prosecution Function" (1975). To the extent that this observation is not reflected by the evidence, it was an improper comment. The inference is, however, that the testimony of the wife would have favored the defendant and, therefore, there is no basis under these circumstances to say that the prosecutor's remarks prejudiced the defendant and resulted in plain error.

Affirmed.