**Mark Steven BARNES, Appellant (Defendant),**

**v.**

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. 92–198.**

Supreme Court of Wyoming.

Aug. 6, 1993.

Leonard D. Munker, State Public Defender and Deborah Cornia, Appellate Counsel, argued, for appellant.

Joseph B. Meyer, Atty. Gen., Sylvia Lee Hackl, Deputy Atty. Gen., Barbara L. Boyer, Sr. Asst. Atty. Gen., and William J. Flynn, Asst. Atty. Gen., argued, for appellee.

Before MACY, C.J., and THOMAS, CARDINE, GOLDEN, and TAYLOR, JJ.

CARDINE, Justice.

This case results from a brutal, senseless beating causing the death of a little five-year-old girl and the subsequent setting of a fire to conceal the crime by burning her body. Appellant Mark Steven Barnes appeals from an amended judgment and sentence on a jury verdict convicting him of second degree murder in violation of W.S. 6–2–104 (1988)[1] and first degree arson for violation of W.S. 6–3–101 (1988).[2] Appellant received consecutive sentences of 30 to 50 years and five to seven years to be served in the state prison.

We affirm.

The issues presented in this appeal, as stated by appellant, are as follows:

[I] Whether the trial court erred by admitting photographs of the victim in violation of W.R.E. 401, 402 and 403, thus depriving appellant of his constitutional right to a fair trial.

[II] Whether the admission of testimony of Officer Reese vouching for the credibility of the State's sole eyewitness against appellant constituted reversible error.

[III] Whether admission of uncharged misconduct evidence violated Wyoming Rules of Evidence and appellant's constitutional right to due process under Art. I, § 6, Wyoming Constitution.

[IV] Whether improper victim impact testimony elicited by the prosecution violated Rules 401 and 403 of the Wyoming Rules of Evidence and requires reversal.

[V] Whether the evidence produced at trial was insufficient to prove beyond a reasonable doubt that the appellant committed arson.

[VI] Whether the trial court's denial of appellant's Motion for New Trial constituted an abuse of discretion.

[VII] Whether the various errors in the admission and exclusion of evidence had a cumulative impact and requires reversal.

Additional issues were presented in a supplemental brief filed by appellant. This brief, not in the form required by our Rules of Appellate Procedure, concerns claims of use of perjured testimony, ineffective assistance of trial counsel, destruction of exculpatory evidence, fabrication of evidence, and malicious prosecution.

## FACTS

Natalie McManaman (McManaman) moved to Cheyenne, Wyoming with her two children, Jonathan, age three, and Brandy Jo, age five, during August 1991. Appellant Mark Barnes (Barnes) testified that he had a different lifestyle than most people in that he travelled, had been in "dangerous situations," and lived in a tent under the Lincolnway bridge at Martin Luther King Park. Barnes moved in with McManaman during November 1991.

Both parties testified to heavy drinking. By mid-December, Barnes had become physically violent, was beating McManaman every day, and she was afraid of him. On December 15, Barnes beat McManaman causing a nose bleed and blackening both her eyes. From this point on, the testimony of the parties is in total conflict.

McManaman testified that in the late afternoon of December 18, after leaving her children with a neighbor, she went to the Cowboy Bar. She returned about 9:30

---

1. W.S. 6–2–104 (1988) provides:
 Whoever purposely and maliciously, but without premeditation, kills any human being is guilty of murder in the second degree, and shall be imprisoned in the penitentiary for any term not less than twenty (20) years, or during life.

2. W.S. 6–3–101 (1988) provides:
 (a) A person is guilty of first-degree arson if he maliciously starts a fire or causes an explosion with intent to destroy or damage an occupied structure.

(b) First-degree arson is a felony punishable by:
 (i) Imprisonment for not more than twenty (20) years;
 (ii) A fine of not more than the greater of twenty thousand dollars ($20,000.00) or two (2) times the face amount of the insurance if the fire was started to cause collection of insurance for the loss; or
 (iii) Both fine and imprisonment.

p.m., picked up her children, put them to bed, and went back to the Cowboy Bar. When she returned home about 12:30 or 1:00 a.m., an angry Barnes was waiting for her. He accused her of "whoring around again" and began beating her with his fists. Brandy Jo came out of the bedroom and told Barnes to stop. He hit Brandy Jo, knocking her against the wall. She fell down. Barnes' temper escalated. He began beating McManaman again. Brandy Jo appeared in the doorway, and Barnes kicked her into the bedroom. He kicked her again over the lower bunk bed, and her head hit the wooden bed. Blood was splattered on the wall.

The beating of McManaman had moved to the kitchen. Barnes continued the beating. Brandy Jo appeared again in the doorway. McManaman asked her to get help at the neighbors' house. The child began crawling to the front door. Barnes kicked her in the head and body, kicking her out the front door. McManaman fought past Barnes to where her daughter was lying on the ground. Barnes kicked Brandy Jo again, lifting her whole body off the ground and then left. McManaman carried Brandy Jo to the shower, washed the blood off, and took her to bed with her. She was confused, could not find a heartbeat or detect breathing, and did not know what to do. She fell asleep or passed out while holding Brandy Jo.

When McManaman awoke the next morning, December 19, Barnes was in the bedroom. He asked what was wrong with Brandy Jo, and McManaman said he knew what was wrong because he killed her. Barnes replied that what happened to Brandy Jo could happen to her and to Jonathan, that "he'd take care of things," and she should leave the house for the day. When she returned, "Brandy was gone." Later she saw a string hanging from a cabinet in the children's bedroom, and she "knew instantly what he'd done with Brandy Jo."

From December 19 and even after the parties were arrested December 27, McManaman tried to cover up what Barnes had done. Barnes continued to beat her and told her the police would believe she killed Brandy Jo and take Jonathan from her. She claimed she feared Barnes would kill her and her son. She sent a note to the neighbor saying that Brandy Jo would not be going to school. She called Barnes' employer and asked that he tell Barnes that Brandy Jo had been hit by a car and killed. She told police that her daughter was in Colorado. She called a friend in Sterling, Colorado and told him that Brandy Jo had been hit by a car and was dead.

The morning of December 27, 1991, Barnes told McManaman that they would hop a train to California that evening. She obtained her deposit from the utility company and went to two bars and then home. Barnes came to the house and instructed her to go to the park with Jonathan where he would meet them. Barnes met them in the park. They proceeded to his shelter under the Lincolnway bridge, and a short time later they heard the fire engines. Cheyenne firemen had, at 9:34 p.m., responded to a fire at McManaman's home at 1000 West 18th Street. Inside a cabinet in the house where the fire had started, they found a child's burned body. An accelerant had been used to start the fire. About 10:30 p.m., McManaman and Barnes were arrested by police.

Mark Barnes' testimony was totally in conflict with that of Natalie McManaman. Barnes testified that he stayed the night of December 17 with McManaman, there was an argument and he left saying he would return for his blankets. That evening, December 18, he returned. McManaman put his blankets in a plastic bag and threw them out the door. He stated he stayed the night in his tent under the bridge, washed at the laundromat the next morning, arrived at work, and was informed that McManaman had called stating that Brandy Jo had been hit by a car and killed. Thereafter, McManaman told Barnes conflicting stories of what happened to Brandy Jo, such as a car accident, a drug overdose, and that she had gone to Colorado to live with her father. On Christmas Eve, there was an argument over the lying about Brandy Jo's disappearance. Barnes hit

McManaman and knocked her through the screen door. Two or three police officers came, and he told them they should ask McManaman about her daughter. On December 27, when they left to go to California, it was, according to Barnes, McManaman who returned to her home to get her food stamps. A short time later, they heard the fire engines.

At the police station, McManaman appeared very intoxicated. She was severely injured. Both her eardrums were broken, her face, arms, thighs, and chest were bruised, and her ear lobe was torn. The jury heard the testimony of Natalie McManaman, Mark Barnes, twenty-eight witnesses called by the State, and seven witnesses called by the defense. After deliberation, Barnes was found guilty of second degree murder and first degree arson.

### PHOTOGRAPHS OF THE VICTIM

■ Appellant claims that, having stipulated to the burning, trauma and death of the victim, the photos did not make the existence of that fact more probable; that oral testimony of the pathologist would have been sufficient to establish the elements of the crime the State must prove; that having conceded what the State was seeking to prove, the photos were unnecessary and, therefore, irrelevant; and if relevant, their probative value was outweighed by unfair prejudice.

■ Evidence is admissible if it is:

(a) authenticated;

(b) relevant; and

(c) not subject to some exclusionary rule.

■ Authentication requires that the thing sought to be introduced is what it purports to be. Thus, W.R.E. 901(a) provides:

The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

In the case of photographs, the proponent must establish that they are an accurate representation of the scene or object depicted. Appellant has not claimed, nor was there objection that, the photos inaccurately portrayed their subject matter. Thus authentication was conceded. Photographs that are authenticated and relevant are admissible in the absence of objection raising some exclusionary rule.

W.R.E. 401, defines relevance as:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Relevant photographs do not become inadmissible because the defendant concedes the fact and cause of the victim's death. *Seyle v. State*, 584 P.2d 1081, 1084 (Wyo. 1978). Following defendant's stipulation, it was argued that the photographs were cumulative and unnecessary. Such claim does not deal with relevancy but concerns the quantum and sufficiency of evidence. Evidence has never been held irrelevant because there was other evidence that may prove the same facts. Rather, the test of relevancy, found in W.R.E. 401, is one of reasonableness and common sense and is to be liberally applied to favor admissibility rather than exclusion of evidence. The photos here were clearly relevant, for they would have a "tendency" to make the existence of facts of "consequence" to the determination of the action (such as date, time, cause of death, and nature and magnitude of injuries) "more probable."

■ Yet the photographs, though authenticated and relevant, may be refused admission into evidence if their probative value were outweighed by danger of unfair prejudice as stated in W.R.E. 403:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

W.R.E. 403 provides that the trial court "may" exclude evidence that is otherwise

admissible. The word "may" is permissive and means that whether to exclude admissible evidence is a matter left to the exercise of sound discretion of the trial court. *Seyle v. State*, 584 P.2d at 1084. The trial court's discretionary rulings on evidence will not be upset absent clear abuse of discretion. *Pearson v. State*, 811 P.2d 704, 707 (Wyo.1991). The burden of establishing such abuse lies with the defendant. *Oien v. State*, 797 P.2d 544, 549 (Wyo. 1990). Judicial discretion means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. *Keser v. State*, 737 P.2d 756, 759 (Wyo.1987). "[A]n abuse of discretion occurs when a court acts in a manner which exceeds the bounds of reason under the circumstances." *Id.* Decisions of the trial court with respect to admissibility of evidence are entitled to considerable deference and, as long as there is a legitimate basis for the trial court's ruling, that ruling will not be reversed on appeal. *Tennant v. State*, 786 P.2d 339, 343 (Wyo.1990).

One hundred or more photographs of Brandy Jo Imhoff were taken before and during the autopsy on her body. Of these, nineteen photos were selected as necessary to illustrate the testimony of the pathologist concerning the severity of injuries, the burning of her body, and the cause of death. Out of the presence of the jury, the pathologist was examined upon voir dire by the attorneys for the State and for the defense. He testified that the photos showed the trauma to the side of the head, the fractures of the skull, the loosened and missing teeth, the size and extent of bruises, the burning, and injuries in the genital area. After agreeing that there would be an emotional response to the photos, the following questions were asked and responses given:

Q. If I could have that, could you, in your words, describe those injuries, I mean you have just described those injuries, haven't you?

A. Yes, I have, in general terms, yes.

Q. What is important for the jury to know about picture 11?

A. Well, as the saying goes, one picture is worth a thousand words, and it's a lot easier to visualize. It aids in understanding a description of [what] essentially can be very dry and scientific or very objective findings like the sizes of bruises or the areas that are bruised. It's much better illustration of what actually occurred.

Q. Illustration, just the emotional effect?

A. Excuse me?

Q. The illustration will get the emotional effect, correct?

A. The illustration will be more easily to comprehend of rather than saying there's a bruise around the eye for 123 millimeters.

Q. You're not concerned that a juror looking at this picture while you are describing it wouldn't have their emotions affect their intellect in listening to what you say?

A. I'm not concerned about the jury and their emotions. I'm concerned about having the jury understand exactly what the injuries are.

Q. And you don't believe you can do that with words?

A. I can certainly state words, but I think pictures can help and are useful in understanding the degree of the injuries.

Q. Are they necessary?

A. They're not necessary for me to read my report and to enumerate where the injuries are and the size of the injuries, but they are—they are very helpful in understanding the actual degree of injury.

Four photographs showed the plastic sheet, lavender blanket, and mattress pad in which the body had been wrapped. Five photographs showed the victim's body from all sides before starting the autopsy. The balance of the photographs showed the missing and loosened teeth, the tooth socket not healed, the tooth inside the girl's mouth, the skull fractures and underlying hemorrhaging, and the underlying soft tissue injuries to the cheek muscle, eye, ear and lip areas. The photographs are graph-

ic. Yet the violent beating causing these massive injuries and the death of this five-year-old girl was a fact in this case which the jury was asked to decide. They could not hide from or refuse to see a critical part of the evidence, gruesome as it was. The death of Brandy Jo is sad indeed and a sad commentary upon the violence in our present day society.

■ Appellant's position is that, conceding the nature, extent and severity of the injuries as necessary and relevant, the pathologist could orally testify to facts that would describe the injuries sufficiently for the jury to comprehend their magnitude. We trust juries to decide cases involving gory, gruesome killings and decide questions of life and death. It is inconsistent that we must sanitize the case by withholding fair evidence of the crime and its results. It was said that "a photograph is worth a thousand words," and we know that is so. The photographs are admissible for that reason in this case and in all cases in which the injuries have special significance and can be more readily perceived, understood and known by use of photographs or visual aids than if conveyed by words alone. To state in words that an abrasion is 15 centimeters in diameter or a bruise is black and blue cannot adequately convey to the jury a comprehension and knowledge of the degree and kind of actual abrasion or bruise.

In *United States v. McRae*, 593 F.2d 700, 707 (5th Cir.1979), the court, in discussing the propriety of admitting a photograph showing the exit wound in the victim's skull, her brain exploded by a dum-dum bullet, stated:

Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403. Unless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudi-

cial effect. As to such, Rule 403 is meant to relax the iron rule of relevance, to permit the trial judge to preserve the fairness of the proceedings by exclusion despite its relevance. It is not designed to permit the court to "even out" the weight of the evidence, to mitigate a crime, or to make a contest where there is little or none.

Admission of a photograph of a child's lacerated heart was upheld in *United States v. Bowers*, 660 F.2d 527, 529 (5th Cir.1981), the court stating:

To be sure, the photograph had the potential to inflame the jury, but we consider it no more inflammatory than photographs that portray the sort of death suffered by the victim in this or any other case where the circumstances surrounding death are at issue. *United States v. Kaiser*, 545 F.2d 467, 476 (5th Cir.1977). The photograph, here, was essential to the government's case if it was to meet its burden of showing that appellant brought cruel and excessive physical force to bear on her child. We cannot say that the prejudice inherent in the photograph substantially outweighed its probative value. We hasten to add that the mere fact that appellant stipulated with the government as to the cause of death did not preclude the government from offering proof on that issue. *United States v. Spletzer*, 535 F.2d 950, 955 (5th Cir.1976); *Parr v. United States*, 255 F.2d 86, 88 (5th Cir.), *cert. denied*, 358 U.S. 824, 79 S.Ct. 40, 3 L.Ed.2d 64 (1958).

*See also United States v. Boise*, 916 F.2d 497, 504 (9th Cir.1990) (upholding admission of autopsy photograph), and *United States v. Naranjo*, 710 F.2d 1465, 1468 (10th Cir.1983) (upholding admission of a color photograph of a victim shot in the face as not unduly or designedly inflammatory).

Photographs excluded generally either have no relevancy at all or are of such doubtful relevance that the probative value is outweighed by unfair prejudice. After stating that a coroner's testimony upon the same facts does not preclude admission of

photographs, *United States v. De Parias,* 805 F.2d 1447, 1454 (11th Cir.1986), the court in *United States v. Eyster,* 948 F.2d 1196, 1212 (11th Cir.1991), found, where defendant was charged with cocaine smuggling, that admission of a photograph of the pilot's burned body in an airplane crash did not have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," Fed.R.Evid. 401. The appellate court urged the trial court to give greater focus to the Rule 403 determination.

Appellant claims the photographs should have been excluded because their probative value was substantially outweighed by unfair prejudice. Identity of the perpetrator was a critical matter being tried to the jury. In this case, it was the State's theory, and the State was required to prove, that it was appellant who assaulted, beat to death, and burned this little girl. Appellant's theory was that it was McManaman who assaulted, killed and burned Brandy Jo. McManaman testified in detail to the several assaults by appellant, the force of the blows, the hitting and the kicking, where the blows were struck and their effect. The photos, showing the magnitude, severity and extent of injuries, were corroborative of her testimony and consequently supported the State's theory of the case.

The jury might also draw inferences from the extent and severity of injuries whether they were inflicted by the girl's mother or a person not related and perhaps stronger than she. The State claims that the photographs were offered also to show malice and intent to kill. The cause of death, whether it was violent, the extent of the beating, and the severity of the injuries might create inferences that would be relevant in identifying Barnes or McManaman as the perpetrator. The photographs were necessary to a clear understanding of the magnitude of the injuries and the force necessary to inflict them. The photographs also were relevant on the question of malice and intent to kill. The photo-

graphs were of substantial probative value which outweighed the danger of unfair prejudice. The photographs were not unfairly prejudicial. The trial court did not abuse its discretion in admitting them into evidence.

## VOUCHING FOR CREDIBILITY

Appellant next claims that Officer Reese, in testifying to how McManaman appeared physically and mentally when she was questioned at the police station, was vouching for her credibility.

W.R.E. 701 allows opinion testimony by a lay witness in providing:

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

We have said:

It was the intent of the framers of the Rules of Evidence to considerably relax the prohibition against receipt of opinion testimony both by expert and lay witnesses. Generally, the rules should be liberally construed to allow the admission of such evidence.

*McCabe v. R.A. Manning Const. Co., Inc.,* 674 P.2d 699, 705 (Wyo.1983). We have been consistent in holding it error to allow a witness to testify that another has told the truth or that the party charged is guilty. *Montoya v. State,* 822 P.2d 363, 365 (Wyo.1991); *Stephens v. State,* 774 P.2d 60, 67 (Wyo.1989); *Zabel v. State,* 765 P.2d 357, 362 (Wyo.1988); *Lessard v. State,* 719 P.2d 227, 233 (Wyo.1986). We likewise have consistently held admissible opinion testimony that explains a victim's behavior in not reporting rape, not leaving home, or fleeing as helpful in understanding the victim's behavior. Thus in *Zabel,* 765 P.2d at 361, we said:

We held that this testimony was permissible because it helped the jury understand one aspect of the evidence—the victim's request to her assailant—and be-

cause the expert's explanation did not constitute testimony with respect to the veracity of the victim. [*Lessard v. State,* 719 P.2d 227, 234 (Wyo.1986) ]. In *Scadden v. State,* Wyo., 732 P.2d 1036 (1987), a police detective testified that victims often delay in reporting sexual abuse or assault, and she went on to explain the reasons for this delay. *Id.* at 1044–45. We held her testimony admissible because it was "offered to rebut the implication by the defense that the victims' delay in reporting the incident was inconsistent with their claims of nonconsensual sexual relations." *Id.* at 1046. In *Griego v. State,* Wyo., 761 P.2d 973 (1988), a rape crisis counselor testified that when the adolescent victim did not immediately flee the scene and report the incident, her behavior was consistent with the typical behavior pattern of adolescent victims of sexual assault. We observed that this testimony helped explain the victim's behavior and held that its admission did not constitute plain error.

■ In this case, McManaman was interrogated by officers first on December 27 and continuing until December 29 when she accused appellant of killing Brandy Jo and setting the fire. Prior to her accusing appellant, she had given statements accusing her ex-husband of the killing, said Brandy Jo had been hit by a car and killed, and that she did not know how it happened. She was vigorously cross-examined by defense counsel, accused of lying, and admitted lying in her prior statements. Defense Counsel asked the officer·

Q. How many times did McManaman lie to you?

A. Several.

Q. Just several?

A. I didn't count them, if that's what you're meaning.

Q. Would it be fair to say that maybe more than you can count?

A. I couldn't answer that.

An understanding of McManaman's appearance, physical and mental condition, and sobriety would be important to explain her inconsistent statements and determine the weight to be given her testimony. Thus, the prosecution asked the officer:

Q. Could you describe her condition at that time [of arrest]?

A. Tired, had been drinking, scared, passive, almost fearful, submissive.

 * * * * * *

Q. Then did you talk to her again the Sunday, the 29th?

A. Yes, we did.

Q. What was her condition at that time?

A. Better, more confident in herself, on a guilt trip, sincere.

 * * * * * *

Q. What about her intoxication at that time, any remnants of that that you could detect?

A. She had sobered up quite a bit. She looked a lot better, was coherent, spoke clearly.

Q. And then did you interview her later on January 4th approximately?

A. I believe I did, yes.

Q. What was her condition at that time?

A. A complete turn around. It's like a hundred percent turn around for her. The information that we have now gotten from her, she seemed relieved.

THE COURT: I'm sorry, what was the date of this?

[Prosecutor]: January 4th, of '92.

[The Witness]: I believe that's the date. Still guilty, looking me in the eye now finally.

Q. With regard to this feeling of guilt, did she express in those interviews why she felt that way?

A. Yes, she did. She said that what happened to her daughter she felt she should have been watching her, she took full responsibility. As a matter of fact, she even told me, you can put me in jail for 150 years, I deserve every bit of it.

Defense, on cross, then asked the officer:

Q. You're not making things up, are you?

A. I think you know me better than that, Mr. [defense attorney]. I don't do that.

Q. You know there's a transcript of these interviews that you're referring to?

A. Yes, I believe there are.

Appellant complains that the use of one word, the word "sincere," in describing McManaman on December 29 was stating an opinion on the credibility of McManaman and the guilt of Barnes. We disagree. The word used, "sincere," is not unlike the many other words used to describe her condition, such as "scared," "passive," "fearful," "confident," "coherent." There was no objection to the word "sincere" at trial, error being claimed for the first time on appeal. Plain error thus is required. Using our often repeated plain error analysis, we find that what was said was rationally based upon the officer's perception of the witness, helpful to a clear understanding of her testimony, violated no rule of law, and was properly admitted by the court. The testimony was, like the following, properly admitted:

Because the witness actually heard the defendant's statements, her characterization of those statements as "verbally abusive" and "showing extreme jealously" were rationally based upon her own perceptions. And, her description was helpful in clarifying the overall nature of defendant's statements.

*People v. Hulsing*, 825 P.2d 1027, 1032 (Colo.App.1991).

Rulings upon the admissibility of evidence rest within the sound discretion of the trial court and will not be disturbed on appeal absent a showing of a clear abuse of discretion. *Montoya v. State*, 822 P.2d at 365. The officer's opinion, based upon his perception of the situation, was helpful, correctly admitted by the court, and not error.

## ADMISSION OF UNCHARGED MISCONDUCT

■ Appellant contends that the testimony elicited concerning the sexual assault on Brandy Jo was uncharged misconduct admitted in violation of W.R.E. 402, 403 and 404(b), and error.

The pathologist testified that Brandy Jo had been sexually assaulted vaginally and anally prior to her death and post-mortem. Vaginal and anal swabs, together with blood samples taken from the victim, her mother, natural father, and appellant and fluids taken from the crime scene were blood typed, tested and analyzed. The trial court ruled, over objection, that the results of the tests would be received in evidence as relevant to the identity of the person who assaulted Brandy Jo and motivation for arson.

The forensic scientist from the Wyoming Crime Lab then testified that the victim, her mother, father and appellant had blood type O. The vaginal and anal swabs disclosed type O blood, a PGM of one plus one minus and P30, a protein found only in men's semen. Tests of the four blood samples revealed PGM of appellant as one plus one plus, McManaman as two plus one plus, Mr. Imhoff as one plus one minus and Brandy Jo as one plus one minus. She then testified that 45 percent of the population have type "O" blood and 17 percent have type "O" blood with a PGM of one plus one minus. The results of DNA testing were inconclusive. Appellant concedes that proof of a sexual assault was plain, clear and convincing, but that there was too little circumstantial evidence to connect appellant to the uncharged sexual acts.

The sexual assaults occurred before the death of the victim and also after her death. The beating occurred December 17, and the arson ten days later on December 27. The sexual assaults were contemporaneous with and part of the same transaction that involved the beating, the death of the victim and the arson. They were a part of the total evidence of injury and trauma to the victim found in the autopsy.

Where a deceased victim had been criminally assaulted, a physician was permitted to testify over objection that such testimony would show the commission of another crime, the court stated:

The criminal assault was a concomitant part of the transaction which resulted in the slaying of deceased, and was admissible under one of the well-recognized exceptions to the general rule excluding proof of other independent crimes, both as tending to show motive for the homicide, and also as a part of the res gestae of the crime charged; or, as Mr. Wigmore prefers to denominate it, as "concomitant parts of the criminal act." 1 Wigmore on Evidence (2nd Ed.) §§ 215–218 * * *.

*State v. Johnson*, 37 N.M. 280, 21 P.2d 813, 815 (1933).

In *Crozier v. State*, 723 P.2d 42, 49 (Wyo.1986), we said:

Another recognized exception to the Rule 404(b) exclusionary rule is that evidence of other criminal activity is admissible if it "forms part of the history of the event or serves to enhance the natural development of the facts." *Commonwealth v. Evans*, 343 Pa.Super. 118, 494 A.2d 383, 390 (1985); *Commonwealth v. Murphy*, 346 Pa.Super. 438, 499 A.2d 1080, 1083 (1985). Pennsylvania refers to this as the "same transaction" rule. It is also known as the "complete story" exception. *State v. Richmond*, 114 Ariz. 186, 560 P.2d 41 (1976), *cert. denied* 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101, *application denied* 434 U.S. 1323, 98 S.Ct. 8, 54 L.Ed.2d 34, *reh. denied* 434 U.S. 976, 98 S.Ct. 537, 54 L.Ed.2d 469 (1977) * * *.

We continued in *Crozier* at 50:

"The time sequence of the [crime] is not continuous if there is some sort of a legal timeout taken during periods while the defendant is committing other crimes * * *." *United States v. Gibson*, 625 F.2d 887, 888 (9th Cir.1980).

Finally in *Crozier*, Justice Urbigkit said:

A differentiation must be recognized between "bad acts" removed from the immediate transaction and all rules appropriate to such evidence, and the immediate-circumstance (same-transaction) evidence to which the rule to be applied is inordinate prejudice without reciprocal probative justification. What happened here should normally be admissible unless the prejudice factors outweigh relevancy.

*Id.* From our discussion, it is clear that the sexual assault is Rule 404(b) evidence and that the same transaction rule states another basis upon which the court may, in its discretion, admit this kind of evidence if its probative value outweighs the prejudice that might result.

The evidence of the sexual assault was offered also as proof of the identity of the person beating and killing Brandy Jo. In considering the requirements for admission under Rule 404(b), in *Pena v. State*, 780 P.2d 316, 321 (Wyo.1989), we said:

We need cite no authority for the precept that identity is always an element of any crime charged, although it is not always in dispute. As such, it is a material issue in any case, although not always in dispute. Finally, being an element of the crime charged, there is a substantial need for the probative value of the testimony. *Bishop [v. State]*, 687 P.2d [242] at 246 [Wyo.1984].

In listing the requirements for admission found in *Bishop v. State*, 687 P.2d 242 (Wyo.1984), we said:

These factors do not serve as absolute requirements for the trial court's exercise of its sound discretion. We give considerable deference to the trial court's discretionary balancing of these Rule 404(b) factors and to its additional required determination under W.R.E. 403 that the probative value of the evidence exceeds the danger of unfair prejudice to the defendant. *Gezzi [v. State]*, 780 P.2d [972] at 978 [ (Wyo.1989) ]; *Garcia [v. State]*, 777 P.2d [1091] at 1096 [ (Wyo. 1989) ]. That one of the stated factors is absent does not necessarily prevent the trial court from exercising its discretion and allowing in the 404(b) evidence.

*Longfellow v. State*, 803 P.2d 848, 851 (Wyo.1990).

That some prejudice would result from this evidence is apparent. Many of the other gruesome details of the violent beating, death and burning of this victim are

repulsive and likely to arouse emotion and anger. Such is always the case. Whether the probative value of the evidence outweighs the prejudice and whether it is unfairly prejudicial is a matter left for decision of the trial judge in the exercise of a sound discretion. The trial court recited identity and motive as the relevant and probative value of this evidence and, in admitting the evidence, ruled that it outweighed any prejudice that might result. In so ruling, we cannot say that the court abused its discretion. The evidence was properly admitted.

### VICTIM IMPACT STATEMENT

Appellant claims that a victim impact statement (VIS) and the prosecutor's subsequent comment upon it in argument was irrelevant to the issues before the jury, which were whether appellant killed the child and set the fire.

McManaman, on rebuttal, after testifying whether she was promised anything for her testimony and other matters, stated as follows:

Q. Natalie, throughout these days of Tuesday, and even up to now, you've been kind of distracted by something. Have you had something in your hand?

A. Yes, I have.

Q. What is that?

A. It's a picture of Brandy Jo.

During rebuttal to closing argument, the prosecuting attorney stated the following:

You recall when she was on the stand. She was constantly distracted. She was accused by defense counsel of not looking people in the eye, not wanting to face you. When it comes out that she is looking at the only remnant she has left of her family now, and that's that soiled picture of little Brandy Jo. That's all she had remaining. Very little if anything left for this lady.

No objection was made to the testimony or to the closing argument. Appellant contends that the testimony was VIS and that it was irrelevant to any issue in the case and therefore inadmissible.

*Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), was cited by appellant as holding it error to admit victim impact testimony. This was a case in which Booth and another entered the home of Irvin and Rose Bronstein, ages 78 and 75 respectively, to steal money to buy heroin. Booth knew the Bronsteins could identify him. The victims were bound and gagged and then killed by stabbing them repeatedly in the chest with a kitchen knife. The question presented to the court concerned the admissibility of VIS authorized by Maryland statute during the penalty phase of a homicide case. A part of the VIS received in evidence was:

The son, for example, said that he suffers from lack of sleep and depression, and is "fearful for the first time in his life." He said that in his opinion, his parents were "butchered like animals."
\* \* \*

The DPP official who conducted the interviews concluded the VIS by writing:

"It became increasingly apparent to the writer as she talked to the family members that the murder of Mr. and Mrs. Bronstein is still such a shocking, painful, and devastating memory to them that it permeates every aspect of their daily lives. It is doubtful that they will ever be able to fully recover from this tragedy and not be haunted by the memory of the brutal manner in which their loved ones were murdered and taken from them."

482 U.S. at 499–500, 107 S.Ct. at 2531–32. The United States Supreme Court held the introduction of a VIS at the sentencing phase of a capital case *irrelevant* to a sentencing decision, the evidence violated the Eighth Amendment, the statute was invalid, and the decision affirming the capital sentence vacated. Because appellant has relied upon *Booth* in this and other cases for a claim of inadmissibility of VIS, we observe that *Booth* was overturned by *Payne v. Tennessee,* —— U.S. ——, ——, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720 (1991), where the United States Supreme Court stated:

We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. "[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family." *Booth*, 482 U.S., at 517, 107 S.Ct. at 2540 (White, J., dissenting) (citation omitted).

We are aware that the claimed victim impact statement in this case was admitted into evidence during the guilt phase of the trial. As to admission during the guilt phase of trial, we have said that VIS, as to how the crime affected the victim, is absolutely *irrelevant* with respect to the issues before the jury. *Justice v. State*, 775 P.2d 1002, 1010 (Wyo.1989). We decline comment upon the admission of VIS during the penalty phase of the trial, noting, however, that it is addressed in W.S. §§ 7–21–101 to –103 (Cum.Supp.1993).

■ The parties recognize, and we agree, that relevancy is the key inquiry presented. VIS may be irrelevant if offered during the guilt phase of the trial as proof of the loss suffered by the survivors, the impact of the killing upon them physically, emotionally, and psychologically and the effect upon the family. Yet it may be relevant if offered for another proper purpose.

■ Credibility of witnesses is always a question of fact for the trier of fact to determine. *La Vigne v. Commw.*, 353 S.W.2d 376, 378–79 (Ky.1962). Witness credibility is subjective and may be affected by personal appearance, the perception of others, credibility of other witnesses, the theory of the case, the theme of the case, the order of witnesses and the character of the jury. 81 Am.Jur.2d *Witnesses* § 1027, p. 840 *citing* Purver, Young, Davis, and

Kerper, *The Trial Lawyer's Book: Preparing and Winning Cases* (1990), § 11.3.

> The credibility of a witness may be attacked by any party, including the party calling him.

W.R.E. 607. A corollary to the rule allowing a party to attack the credibility of a witness is to permit the opposing party to bolster that credibility. Thus it has been held that:

> Thus, the credibility of a witness does not have to have been the subject of attack before it can be bolstered as was traditionally required in past. *Biunno, [Current N.J. Rules of Evidence*, comment 4 to Evid.R. 20 (1990 Anno.)], at 263 (citing *State v. Parsons*, 83 N.J.Super. 430, 437, 200 A.2d 340 (App.Div. 1964)). The party calling a witness may thus attempt to support credibility through direct or redirect examination and through the introduction of extrinsic evidence. *Ibid.* (citing *State v. Johnson*, 216 N.J.Super. 588, 603, 524 A.2d 826 (App.Div.1987)). Expert testimony may now be used to support a witness' credibility.

*State v. Frost*, 242 N.J.Super. 601, 577 A.2d 1282, 1288 (1990). We note that credibility may be supported or attacked by evidence of character for truthfulness or untruthfulness and by specific instances of conduct only as provided in W.R.E. 608, but the restrictions therein do not apply to the effort to bolster credibility in this case.

■ During cross-examination, McManaman's credibility was repeatedly and vigorously attacked. She was asked many times why she did not look at defense counsel, why she did not look at Barnes, why she did not look members of the jury in the eye when she spoke. In closing argument, defense repeatedly attacked her credibility by calling her a liar.

There was no objection to the VIS of McManaman or to the argument of the State's attorney. Lack of objection would allow us to consider appellant's claim under the doctrine of plain error. But that is unnecessary because there was no error in presenting this evidence, plain or otherwise. The evidence was relevant as bol-

stering the credibility of the witness after an attack upon that credibility. There was no plain error or any error at all in its admission.

## SUFFICIENCY OF EVIDENCE FOR ARSON

■ Appellant claims that the evidence in this case was insufficient for a conviction of arson because the house set on fire was not an occupied structure. In reviewing the sufficiency of evidence claims, this court has applied the following standard of review:

Our standard for arriving at a determination of the sufficiency of the evidence is to determine whether it is adequate to support a reasonable inference of guilt beyond a reasonable doubt to be drawn by the finder of fact, viewing the evidence in the light most favorable to the State. The test is the same, whether the case was tried to the court or to a jury.

*Lopez v. State*, 788 P.2d 1150, 1152 (Wyo. 1990).

The Wyoming first degree arson statute, W.S. 6-3-101 (1988), provides:

(a) A person is guilty of first-degree arson if he maliciously starts a fire or causes an explosion with intent to destroy or damage an occupied structure.

(b) First-degree arson is a felony punishable by:

(i) Imprisonment for not more than twenty (20) years;

(ii) A fine of not more than the greater of twenty thousand dollars ($20,000.00) or two (2) times the face amount of the insurance if the fire was started to cause collection of insurance for the loss; or

(iii) Both fine and imprisonment.

The information filed herein, as amended on May 19, 1992, charged Barnes with committing first degree arson on or about December 27, 1991. McManaman was renting the dwelling house where the fire was set. She had sold her furniture. She, Jonathan and appellant left that evening to catch a train to go to California. They had abandoned the house with no intention of re-turning. The claim therefore, is that the house was unoccupied; ergo the crime was not first degree arson.

The following instructions, not objected to by either party, were given the jury:

## INSTRUCTION NO. 4

The necessary elements of the crime of first degree arson are:

1. The crime occurred within the county of Laramie, on or about the date of December 27, 1991; and

2. The defendant did unlawfully, feloniously and maliciously start a fire;

3. With intent to destroy or damage an occupied structure.

If you find from your consideration of all the evidence that any of these elements has not been proved beyond a reasonable doubt, then you should find the defendant not guilty.

If, on the other hand, you find from your consideration of all the evidence that each of these elements has been proved beyond a reasonable doubt, then you should find the defendant guilty.

## INSTRUCTION NO. 5

Wyoming Statutes provide in part:

" 'occupied structure' means a structure * * * whether or not a person is actually present: in which a person may reasonably be expected to be present."

■ The instructions given the jury, without objection, became the law of the case. *Apodaca v. State*, 627 P.2d 1023, 1026 n. 6 (Wyo.1981); *Russell v. State*, 583 P.2d 690, 700 (Wyo.1978). Our inquiry is directed to determining under what circumstances a structure qualifies as occupied without a person actually being present in the structure. Instruction No. 5 provides an occupied structure is one "in which a person may reasonably be expected to be present." The question now is, expected by whom—the arsonist or the owner or mankind generally.

A review of cases is helpful. It has been said that:

"The term 'dwelling house' has a broader meaning than a house that is actually occupied as such. It means any house intended to be occupied as a residence, and would include any such residence, even though not occupied by the complaining witness at the time of the burning."

*People v. Losinger*, 331 Mich. 490, 50 N.W.2d 137, 143 (1951) (*quoting* 2 Gillespie, *Michigan Criminal Law and Procedure*, § 819).

In *Smith v. State*, 256 Ind. 546, 270 N.E.2d 743, 744 (1971), the court noted that the term "dwelling house" in its arson statute took in the burning of a presently unoccupied rental dwelling. And in *Kreijanovsky v. State*, 706 P.2d 541 (Okl.1985), the arson statute required that the structure burned be "inhabited or occupied by one or more persons." An instruction stating "[a] building or structure is deemed to be inhabited if any part of it is normally used by any person for lodging" was upheld. A policy reason for the rule was said to be the high risk to firefighters and rescuers who may believe that people are present.

We agree with the authorities cited and hold that a structure "in which a person may reasonably be expected to be present" is one that is intended to be occupied and usually and normally is occupied and would be perceived by any reasonable person to be an occupied structure, although unoccupied at the time. To hold otherwise would be to approve as second degree arson only the burning of all houses displaying "for rent" and "for sale" signs which often are unoccupied. We are comfortable holding that this was an occupied structure within the instructions given and that the correct charge was first degree arson.

## MOTION FOR NEW TRIAL

 Barnes complains next that the trial court abused its discretion in denying his motion for a new trial based upon newly discovered evidence and alleged perjury. A decision to either grant or deny a motion for new trial is within the sound discretion of the trial court and the ruling will not be disturbed absent an abuse of discretion.

*Keene v. State*, 835 P.2d 341, 344 (Wyo. 1992); *Brown v. State*, 816 P.2d 818, 822 (Wyo.1991); *Story v. State*, 788 P.2d 617, 623 (Wyo.1990); *Best v. State*, 769 P.2d 385, 387–88 (Wyo.1989); *Keser*, 737 P.2d at 759; *Grable v. State*, 664 P.2d 531, 532 (Wyo.1983).

 In order to obtain a new trial on the grounds of newly discovered evidence, a defendant must establish that:

1. The evidence has come to his knowledge since the trial;

2. It was not owing to the want of due diligence that it did not come sooner;

3. The evidence is so material that it would probably produce a different verdict; and

4. The evidence is not cumulative.

*Keser*, 737 P.2d at 759–60 (*citing Opie v. State*, 422 P.2d 84, 85 (Wyo.1967)). All of the above factors must be present in order to grant a motion for new trial. If any of these factors is not satisfied, then there has not been an error of law committed by the court under the circumstances and no abuse of discretion will be found. *Gist v. State*, 737 P.2d 336, 340 (Wyo.1987); *Grable*, 664 P.2d at 535.

At the hearing on the motion for a new trial, appellant called two witnesses, Nora and Dale Poling. Nora testified that McManaman had written her three letters and called her from jail stating that if she testified against Barnes, she would get her son back and be given three years probation, and that she had been interviewed by the public defender and the police and had forgotten to tell them about this. She could not produce the letters. She also testified that the day before and the day after the murder she had seen a red pickup truck with Colorado plates parked at McManaman's house, and that she had recalled this only after reading about Barnes in the newspaper. Nora's son Dale next testified that he had seen a red truck parked at McManaman's the day before and the day after Brandy Jo was killed; that it may have been a GMC and was driven by a gray-haired man in his 60s. Officer Korber testified that he inter-

viewed both Nora and Dale prior to trial, that they said it was an orange pickup and could not give any specific dates. The officer, as a result of his investigation, had concluded that the truck was that of the used furniture dealer who had purchased and came to pick up McManaman's furniture.

The court, after hearing argument, denied the motion stating:

THE COURT: Thank you. Addressing the motion for new trial, those are denied. The Court finds that the evidence referred to here was, to the extent it constitutes any credible evidence, was available at the time of trial. This Court finds the Poling testimony unbelievable. The Court is told that having been next door to this house, that is the McManaman residence, that Ms. Poling having heard the shocking news from what the State alleged happened there, didn't think that she had seen an orange or a red truck there. She's interviewed repeatedly by the police, didn't think to say it then, was subpoenaed by both sides to the trial and was present at the trial, didn't think about it then, and the blatant, unacceptable, unbelievable testimony here today is the fact of reading of the conviction in the paper brought it to her mind. That simply defies any logic, is not believable, and the Court does not accept that testimony as credible.

To the extent it is credible and relevant testimony or evidence, it was available at the time of the trial, and so those motions are denied.

The two witnesses who testified at the motion hearing were not new witnesses. Both were interviewed before trial by the police and the public defender. Both were subpoenaed and were at the trial. Dale Poling testified and was cross-examined. Nora Poling was present at trial, but not called. The question of identity of the killer was primary from the day of discovery of the homicide until the end of the trial. The evidence testified to by Nora and Dale Poling at the new trial motion was either not newly discovered or evidence that could have been discovered by the exercise of diligence. The trial court's comments were a discussion of its weight and probative value and as such not improper. In any event, it is clear that such evidence would not probably have produced a different verdict. There was no abuse of discretion in denying the motion for new trial.

## CUMULATIVE ERROR

A claim of cumulative error depends on error being recognized. *Justice*, 775 P.2d at 1011. Absent a finding of two or more of the errors asserted by Barnes, there cannot be cumulative error. *Dice v. State*, 825 P.2d 379, 387 (Wyo.1992). Having found no error in the trial in this case, there is no basis for finding cumulative error.

## PRO SE BRIEF OF APPELLANT

Appellant has filed a pro se brief with numerous exhibits attached. The exhibits consist generally of statements and police reports. The brief is without a statement of issues, without record citations, without cogent authority to support arguments, and, in general, argues the conflicts in testimony and that he was convicted upon the perjured testimony of McManaman and police. Because the claims of appellant in his brief have either been presented by his counsel and resolved by us or are not adequately and cogently presented for discussion, we decline to address them.

Affirmed.

THOMAS, J., files an opinion concurring specially.

THOMAS, Justice, concurring specially.

I agree that Barnes' conviction and the judgment and sentence should be affirmed. I write to address the issue of the sufficiency of the evidence. I am sure the discussion of when a structure is deemed to be occupied will be useful in future instances. The entire statutory definition reads:

(v) "Occupied structure" means a structure or vehicle whether or not a person is actually present:

(A) Where any person lives or carries on business or other calling;

(B) Where people assemble for purposes of business, government, education, religion, entertainment or public transportation;

(C) Which is used for overnight accommodation of persons; or

(D) In which a person may reasonably be expected to be present.

WYO.STAT. § 6–1–104(a)(v) (1988).

The majority opinion focuses on subsection (D), but the other definitions, except for subsection (B), are pertinent and seem to fit the persuasive authority cited.

The statutory definition for the crime of which Barnes was convicted is:

(a) A person is guilty of first-degree arson if he maliciously starts a fire or causes an explosion with intent to destroy or damage an occupied structure.

WYO.STAT. § 6–3–101(a) (1988).

The factual background included in the majority opinion notes that an accelerant had been used to start the fire in the house. The only conclusion to be drawn is that some person (in this instance, Barnes) was inside the house in order to start the fire. There is no need, therefore, to rely upon the house (structure) being occupied in law; it was occupied in fact by the arsonist at the time the fire was started. On that basis alone, I would reject the claim that the evidence of the crime of first-degree arson was insufficient because there was no evidence that the house was not an occupied structure.